144 N.J. Super. 39 (1976)
364 A.2d 553
IN THE MATTER OF THE APPLICATION OF UNION COMMUNITY BANK FOR A CHARTER AT 1981 MORRIS AVENUE, UNION TOWNSHIP, UNION COUNTY, NEW JERSEY.
Superior Court of New Jersey, Appellate Division.
Argued September 13, 1976.
Decided September 29, 1976.
Before Judges CARTON, KOLE and LARNER.
Mr. Justin P. Walder argued the cause for appellant (Messrs. Walder, Steiner, Sondak & Evenchick, attorneys; Mr. Walder and Mr. Barry H. Evenchick of counsel; Mr. Evenchick on the brief).
*40 Mr. Kenneth L. Estabrook argued the cause for cross-appellant Union Center National Bank (Messrs. Lindabury, McCormick & Estabrook, attorneys; Messrs. Estabrook, Peter A. Somers and William R. Watkins on the brief).
Mr. Richard A. Norris argued the cause for cross-appellant Franklin State Bank (Messrs. Norris, McLaughlin, Trucker & Marcus attorneys; Mr. Norris on the brief).
Mr. Michael E. Goldman, Deputy Attorney General, argued the cause for respondent Richard F. Schaub, Commissioner of Banking (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel; Mr. Michael E. Goldman, Deputy Attorney General, on the brief).
The opinion of the court was delivered by KOLE, J.A.D.
In October 1973 Union Community Bank filed an application with the Department of Banking seeking a new bank charter. Hearings on that application were conducted in March and April 1974. Union Center National Bank and Franklin State Bank appeared in opposition to the grant of the charter.
On September 24, 1974 the hearing officer submitted his report, recommending approval of the charter application subject to certain conditions. Two of these conditions are pertinent for the purposes of this appeal.
The first is that the Borinsky family and business associates divest themselves of sufficient shares of stock in the bank so that their "total participation is not in excess of 10% of the outstanding shares," and in no event should any "spinoff result in any individual, family and/or group of business associates owning in excess of 10% of the bank's stock." The hearing officer found that this procedure would be beneficial to the public as well as those financially interested in the success of the bank, and would accord with the consistent position of the Department that it is unwise "in a new bank *41 situation for one individual, one family or one group of business associates to own in excess of 10% of the outstanding shares of the bank." The second condition is the resignation, at his option, of Sanford Borinsky, an officer and director of the Bank of Bloomfield, from either that bank or the proposed bank. See N.J.S.A. 17:9A-3 B.
After a careful consideration of the proofs, and detailed findings predicated thereon, the hearing officer concluded that, subject to the recommended conditions for approval, the requirements of N.J.S.A. 17:9A-11 D for the granting of a bank charter to the applicant had been satisfied. Among other things, he determined that (1) the conditions in the locality in which the proposed bank will transact business afford reasonable promise of successful operation (N.J.S.A. 17:9A-11 D(2)); (2) the directors possess the qualifications, experience and character required for the duties and responsibilities with which they will be charged (N.J.S.A. 17:9A-11 D(3)), and (3) the interest of the public will be served to advantage by the establishment of the proposed bank (N.J.S.A. 17:9A-11 D(1)).
With respect to the criterion of whether the interest of the public would be served to advantage, the hearing officer found no substance to a claim that the proposed bank would disserve the public interest because some of the incorporators and/or directors held influential municipal positions in the township. Relying on a prior ruling by the Department, he found that the hypothetical potential conflict of interest in this respect, as opposed to an actual conflict, did not support the claim.
The hearing officer further found that the public interest standard would not be offended by reason of the approximately 31% control by the Borinsky family and business associates, provided approval of the application be conditioned, as indicated, on a divestiture of their stock so that their total participation not exceed 10% of the outstanding shares. Nor, according to the hearing officer, would Sanford Borinsky's relationship to the Bloomfield State Bank violate that *42 standard, if approval of the application were conditioned on his resignation, as heretofore indicated.
By decision and order of April 17, 1975 the Commissioner denied the application for a charter. The applicant, Union Community Bank, appealed. The objector banks, Union Center National Bank and Franklin State Bank, cross-appealed.[1] We granted appellant's motion to stay the appeal pending its motion before the Commissioner for reconsideration of his April 17, 1975 decision and order. On September 5, 1975 the Commissioner denied the motion for reconsideration without a hearing. That denial is also before us for review.
In his decision and order of April 17, 1975 the Commissioner adopted "in toto" the findings and analysis of the hearing officer's report and recommendation relevant to the satisfaction of the requirements of N.J.S.A. 17:9A-11 D(2) and (3). He specifically noted that his later discussion of the public interest issue was not to be considered as a negative reflection upon the character, qualification or fitness of the proposed directors, since "such a conclusion is contrary to my express findings."
He then addressed himself to the question of whether the interest of the public would be served to advantage under N.J.S.A. 17:9A-11 D(1) by the approval of the application.
The entry of a proposed bank within the projected trade area, he stated, would constitute "a refreshing competitive and conveniently located market entity." He found that "to this degree" the approval of the application would serve the interest of the public to advantage.
*43 Looking "deeper" into the matter of public interest, he examined each major assertion of the objectors individually and "especially" cumulatively before a finding could be rendered on that issue.
In line with prior decisions of the Department, he concluded that the participation of proposed interim directors and/or incorporators who are also municipal officials was not contrary to the public interest merely because of possible or inherent conflicts of interest. He agreed with the hearing officer that the possibility of an actual conflict "is far from being an actual conflict," and noted that "the applicability of this area of inquiry has been diluted due to the fact that, since the hearings, the municipal affiliations of the incorporating group have been substantially lessened." The Department, he said, "on many occasions, has held that the possibility of conflict for persons who hold certain dual responsibilities is not so great as to require the denial of a new charter application."
He further found that Sanford Borinsky's relationship with the Bloomfield State Bank was no bar to approval of the application, since the department "has consistently conditioned its approvals on the individual with the conflict electing to sever his ties either with the proposed or existing banking institution." Thus, he concurred in the hearing officer's conclusion that the application should not be denied solely by reason of Sanford Borinsky's being an incorporator, substantial stockholder and director of the Bloomfield bank. "Besides," he stated, "if a real conflict were evidenced, the usual solution would be to cure the defect, and not to deny the entire application."
The scope of our review in the present case is limited. The foregoing findings and conclusions of the Commissioner are supported by his reasoned judgment and substantial credible evidence in the record, considering the proofs as a whole, as well as his expertise and the policies underlying the banking act. In re Kenilworth State Bank, 49 N.J. 330 (1970); In re Howard Savings Institution of Newark, 32 N.J. 29 *44 (1960); In re Peoples Bank of Montvale, 111 N.J. Super. 141 (App. Div. 1970). See also, Mayflower Securities v. Bureau of Securities, 64 N.J. 85 (1973).
It is with respect to the further finding and the ultimate conclusion of the Commissioner predicated thereon that we take issue. We refer to the finding that the "objectors have pointed to numerous situations which, in and of themselves, are less than damaging, but which cumulatively present too many roadblocks on the path to establishing an operating banking institution which serves the public to advantage." "This being the case," the Commissioner concluded, "the application of the Union Community Bank is denied."
The finding is so general in nature as to preclude adequate judicial review of the actual reasons for the Commissioner's denial of the application. It appears to be predicated on the control of the proposed bank by the Borinsky interests. Even if that is the reason, no satisfactory explanation is given for an outright denial, rather than, in accordance with the Commissioner's past practice, a grant conditioned on an actual divestiture of such control so that such interests would own no more than 10% of the bank's shares of stock.
The finding is even more puzzling when one considers the Commissioner's discussion immediately prior thereto.
Thus, he referred to the following assertions by the objectors in support of their claim that the public interest would not be served to advantage by the new bank: (1) too great a segment of the proposed bank's stock was to be held by a group with "strikingly similar interests"  the Borinsky family held over 31% of the outstanding shares, while the remaining directors had subscribed for only 7% thereof; (2) the Borinsky interests dominated the steering committee which chose most of the incorporators and directors, and (3) they owned the site which the bank was to utilize, had advanced all "seed" monies to date, and generally seemed to have actual and effective control of the bank's organization.
*45 He proceeded to discount the importance of each of these factors in the following manner:
It is not uncommon for an individual or small group of individuals to recognize the need of chartering a new bank; nor is it always bad practice for a new bank group to purchase its location from one amongst themselves. Similarly, by Decision and Order, I have often required that no individual, family or group of business associates own in excess of 10% of stock of a bank after the customary 30 to 40% spin-off to the public.
Notwithstanding the minimization of such considerations, he then made the general finding as to "numerous situations" pointed to by the objectors, which "in and of themselves are less than damaging, but which cumulatively present too many roadblocks" to a bank that would serve the public to advantage, and grounded the denial of the application on that finding.
The applicant's later motion before the Commissioner for reconsideration was predicated on a post-denial restructuring of the group of incorporators and the proposed interim board of directors in an endeavor to cure the deficiencies which appeared to prompt the refusal to approve the application. Thus, four members of the Borinsky family, accounting for 20,500 subscribed shares, agreed to withdraw as incorporators and subscribers; Arthur Borinsky, the only family member on the interim board, agreed to reduce his subscription from 7,500 to 6,000 shares; the township mayor and magistrate withdrew as incorporators and subscribers; the membership of the interim board was increased; Sanford Borinsky resigned his position as director of the Bank of Bloomfield; the bank stock ownership was restructured so that Borinsky family participation was limited to Sanford and Arthur Borinsky, with a total reduced holding of less than 9% of the total stock, and the remaining directors had subscribed for about 16% of the bank's stock. These steps were taken, according to the applicant, to "obviate the substantial time and expense in making a reapplication" some two years after the application had been filed.
*46 As indicated, the motion for reconsideration was denied by the Commissioner without a hearing. In his decision on that motion he for the first time stated that the denial of the application for a charter was based "primarily on a finding that the extensive control which resided in the hands of relatively few, related members of the incorporators and proposed interim board of directors was not in the public interest, especially in light of the manner in which that control had been and could be exercised." He held that the endeavor by the applicant "to cure the substantive concerns expressed" in his earlier denial by the restructuring constituted in essence a new application "which must be considered in light of the recent approvals in the area." He found no justification for reconsidering the application or the denial thereof. Even though there was established precedent for permitting approval of a charter conditioned on an appropriate dilution of control of the proposed bank, he concluded that reconsideration "should not be engaged in to permit an applicant or objector to change its presentation after receiving the Department's decision and the reasons therefor" (emphasis supplied).
But the "reasons" for the denial were legally deficient. They did not comply with the requirement that findings and reasons given by an administrative agency for its ultimate determination must be clear and specific. Unless that standard is met, the interested parties will not know the precise factual basis upon which the result has been reached by the agency, and the reviewing court will not be in a position readily to determine whether the decision is sufficiently and soundly grounded or derives from arbitrary, capricious or extra-legal considerations. In re Howard Savings Institution of Newark, supra, 32 N.J. at 52; Benjamin Moore & Co. v. Newark, 133 N.J. Super. 427 (App. Div. 1975). See also, Cunningham v. Dept. of Civil Service, 69 N.J. 13, 26 (1975).
Additionally, here there was a sharp departure by the agency in a specific case from an established administrative *47 practice or policy by reason of which an applicant was denied relief. Under these circumstances, fairness to the applicant, as well as appropriate court review of the validity of such a significant ad hoc change, requires that the agency plainly articulate the rationale therefor and afford the applicant, as well as the objectors, a hearing at which to meet, explain or refute whatever information is submitted. See In re Senior Appeals Examiners, 60 N.J. 356, 365 (1972); In re Masiello, 25 N.J. 590, 599 (1958); Elizabeth Federal S. & L. Ass'n., 24 N.J. 488, 506-507 (1957). Compare National Community Bank of Rutherford v. Howell, 106 N.J. Super. 317 (App. Div. 1969).
The Commissioner erred in not affording such a hearing to challenge his determination that denial of a charter, rather than approval conditioned on dilution of control by the Borinsky interests, was the proper course in this case. All parties should have been, and should now be, afforded an opportunity to present proofs and argument at a hearing limited to the issues of whether or not (1) the proposed restructuring of control is bona fide and is such as to justify approval of the charter under the public interest criterion of N.J.S.A. 17:9A-11 D(1); and (2) the "economic uneasiness" and the regulatory and other difficulties arising from "single interest" control referred to in the Commissioner's original decision and order in fact would be obviated by such restructuring. Thereafter, the Commissioner should make appropriate findings and conclusions required by law.
Accordingly, the decisions and orders of the Commissioner of April 17, 1975 and September 5, 1975 are reversed, and the matter is remanded to him for further hearing and findings and conclusions in accordance with this opinion. The hearing shall be held, and the findings and conclusions made, within 60 days from the date of this opinion.
We retain jurisdiction.
NOTES
[1] Since the Commissioner's ultimate determination was not adverse to them and appeals are not from opinions, but from judgments or orders, there is no basis for the cross-appeals. We have, of course, considered the contentions advanced in the cross-appellants' briefs and oral argument.