592 A.2d 250

IN RE PETITION OF HACKENSACK WATER COMPANY TO
THE WATERSHED PROPERTY REVIEW BOARD.

IN RE PETITION OF THE HACKENSACK WATER COMPANY
FOR REMOVAL FROM RATEBASE AND TRANSFER
OF EXCESS LANDS.

Superior Court of New Jersey
Appellate Division

Argued April 30, 1991—Decided June 7, 1991.

Before Judges ANTELL, SCALERA and KEEFE.

*Timothy D. Searchinger,* admitted *pro hac vice,* argued the cause for appellants Environmental Defense Fund and Bergen Save the Watershed Action Network (*Edward Lloyd* and *Timothy D. Searchinger,* on the brief).

*Kenneth McPherson* argued the cause for respondent Hackensack Water Company (*Waters, McPherson, McNeill, P.C.,* attorneys; *Kenneth McPherson* and *Robert J. Donaher,* on the brief).

*Carla Vivian Bello,* Senior Deputy Attorney General, argued the cause for respondents New Jersey Watershed Property Review Board and Board of Public Utilities (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Carla Vivian Bello,* on the brief).

The opinion of the court was delivered by

ANTELL, P.J.A.D.

Appellants herein are the Environmental Defense Fund and Bergen Save the Watershed Action Network, presumably nonprofit organizations organized and functioning to monitor conditions potentially adverse to the environment. They appeal from orders dated January 12, 1990, of the Watershed Property Review Board (hereinafter "Review Board") and the Board of Public Utilities (hereinafter "BPU") permitting the Hackensack Water Company (hereinafter "Hackensack") to divest itself of 287 acres of watershed property. Appellants contend that the orders were granted without sufficient regard to the adverse impact the property transfer would have upon open space, water quality, recreation and conservation.

In 1981 BPU issued an order which required Hackensack to justify its retention of all lands included within its rate base "in order that surplus lands could be identified, removed from rate base and thus no longer reflected in customer rates." As a result, after securing a study of its land inventory, Hackensack petitioned BPU on December 12, 1983, pursuant to *N.J.S.A.* 48:3–7, for permission to transfer 700 acres of excess property to a nonutility affiliate, Rivervale Realty Co., Inc. (hereinafter "Rivervale"). BPU determined that the property was not needed for buffer purposes and approved the transfer out of rate base in a decision dated December 17, 1984.

On December 30, 1987, Hackensack filed a further petition under *N.J.S.A.* 48:3–7 with the BPU seeking approval for the transfer of an additional 287 acres of land which it claimed were no longer used and useful for public utility purposes. The tracts, surrounding the Oradell Reservoir in Bergen County, were then being used as private golf courses by the Emerson Golf Club, the Pascack Valley Country Club and the Haworth Golf Club. Public comment hearings were conducted on June 2, 1988, and evidentiary hearings were held on June 23 and 28, and July 15, 1988. These largely addressed the issue of watershed protection.

The proposed transfer by Hackensack was the target of vigorous opposition based upon the belief that transfer of the buffer lands would imperil water quality. At the time, there were no definite state standards or regulations to safeguard the transfer of peripheral land serving as a watershed buffer. However, while the application was pending before BPU, the State Legislature introduced a bill which would eventually be enacted as the Watershed Protection and Moratorium Act, and which directly addressed the Hackensack application. Because of the anticipated legislative action BPU decided not to act on the matter before the Legislature and the Governor completed their work.

On November 16, 1988, the Watershed Protection and Moratorium Act (hereinafter "the Moratorium Act") was enacted as P.L.1988, c. 163. It placed an 18-month moratorium on transfers of watershed property by public utilities and directed the Department of Environmental Protection (hereinafter "DEP") to "evaluate the effectiveness of establishing buffer zones around public water supply reservoirs for the purpose of protecting drinking water quality." DEP was further directed to transmit its study, upon completion, to the Governor, the BPU and the Legislature. The Act provided for exemptions from the moratorium, but only upon a showing "that there is a compelling public need for the conveyance of the property, that the denial of the exemption would result in extraordinary hardship, or that the sale or development of the watershed property is otherwise consistent with the purposes of this act." Applications for exemptions under the Moratorium Act were made subject to consideration by the Review Board, which was created by the Act, consisting of the Commissioner of DEP, the Commissioner of the Department of Community Affairs and the President of the BPU.

Section 4 of the Moratorium Act delineates additional criteria concerning water quality, open space, recreation and conservation to be considered by the BPU in connection with applications under *N.J.S.A.* 48:3-7 for permission to transfer public

utility watershed land to entities not subject to the jurisdiction of the BPU.

According to a news release from the office of Governor Kean dated November 17, 1988, "[t]he legislation was introduced to protect 287 acres in Bergen County owned by the Hackensack Water Company from sale and development." The release also quoted the Governor as stating that "[p]reservation of open space is a top environmental priority of this Administration." The Moratorium Act has since been extended under P.L.1990, c. 19, to until such time as DEP adopts "rules and regulations establishing buffer zones for all watershed lands associated with public water supply reservoirs for the purpose of protecting drinking water quality."

Recognizing that the Moratorium Act was drafted to meet this precise case, by decision and order dated February 15, 1989, the BPU determined that it was precluded from considering or acting on Hackensack's application until the exemption requirements of the Moratorium Act had been satisfied. Although the order and decision were not issued until February 15, 1989, the BPU had apparently announced its determination at a public meeting of December 14, 1988, and Hackensack filed its appeal therefrom with the Appellate Division on December 29, 1988, under Docket A–2468–88T1.

On February 17, 1989, Hackensack applied to the Review Board for an exemption under the Act on the ground that the transfer was justified by a "compelling public need," and was "otherwise consistent with the purposes of th[e] act." Hackensack's application was accompanied by a statement that it would be willing to restrict the property, after conveyance to its subsidiary, Rivervale, "to golf and country club uses." The application acknowledged that under the Moratorium Act the Review Board was required "to assess the environmental impact of proposed conveyances ... upon 'water supply,' 'open space,' 'conservation' and 'recreation.'"

A public hearing was held on August 17, 1989, before the Review Board at which Hackensack presented its "Evergreen Plan," ostensibly designed to insure that the 287 acres proposed for transfer would be permanently used for golf course purposes. The plan was rejected, however, because of its lack of assurance that the use restrictions would be permanent and unqualified. The Evergreen Plan then presented provided that Rivervale and its transferees could terminate unilaterally the golf course use restriction at their option or upon condemnation or a court determination that either the 700-acre tract or the 287-acre tract was subject to the Moratorium Act. The Review Board therefore could not find that Hackensack's proposal was "consistent with the purposes of the Act." The exemption application was denied at the Review Board's open public meeting of December 14, 1989, "without prejudice to the Company's submission of further proposals to meet the stated Review Board concerns."

By letter of January 5, 1990, counsel for Hackensack wrote to the Review Board and to BPU to advise that the company had addressed the concerns noted by the Review Board, that it had "subsequently met with Review Board Counsel and Staff," and that the company had been advised by counsel and staff that the new proposed deed restrictions prepared by the company "adequately satisfied those concerns." Thus, Hackensack requested "that the Review Board and BPU convene to formalize the conditions outlined in the deed restrictions assuring permanent dedication of the properties to golf course use." The letter also suggested that the Review Board "Sunshine Notice the record on file ... for public inspection and ... similarly notice the sequential meetings by the Review Board and BPU on January 12, 1990."

The Review Board met to consider the modified deed restrictions on Friday afternoon, January 12, 1990, after two days' public notice. Vehement protests were voiced by members of the public and elected officials as to the limited period of time, prior to the meeting, they were provided to examine the mod-

ified proposals. A new State government administration was to take office within four days after the date of that meeting, and in denying the requests for delay the President of the Review Board reasoned that if the Board did not make a decision that day a new membership would thereafter have to "be entirely constituted before any further meetings would be likely to be held."

At the outset of the meeting, counsel to the Review Board announced that the new deed restrictions "now require that these properties be permanently restricted to golf course and country club use in perpetuity. In addition to that, this restriction limited any construction on the property commensurate with that purpose to 15 percent impermeable cover." The BPU President, acting in her capacity as a Review Board member, agreed that the deeds would "permanently dedicate these properties to golf course and country club purposes" and that "these deed restrictions will continue to keep these lands open." The acting DEP Commissioner, who was also a member of the Board, observed that the restrictions would keep "the land in perpetuity." Accordingly, the BPU president and DEP commissioner found the exemption to be "consistent with the purposes of the Act." The Commissioner of the Department of Community Affairs dissented.

Immediately following the Review Board conference the BPU president, who had presided over the meeting of the Review Board, convened a telephone meeting with one other member of the BPU. The BPU then voted to allow the transfer.

In their written decisions, dated January 12, 1990, the same day on which the public hearing was held, both boards made the modified restrictions proposed by Hackensack conditions of approval. Both decisions stated that "[t]he initially proposed restrictive covenants are herein modified so as to provide for the unqualified, permanent restriction of these properties to golf course use, and appurtenant country club uses, in perpetuity." The decision and order of the Review Board also stated

that the terms of transfer are such that the property will be restricted to golf course and appurtenant country club uses "subject to indefeasible restrictions against uses inimical to the maintenance of water quality."

We conclude that the orders of January 12, 1991, must be reversed and the matters remanded to the agencies for further proceedings. Our reasons follow.

The specific object of the Moratorium Act was to restrain this very transfer—at least until adoption by the DEP of rules and regulations establishing buffer zones related to public utility watershed land. "The reason of the law, *i.e.*, the motive which led to the making of it, is one of the most certain means of establishing the true sense of the words." *Caputo v. The Best Foods*, 17 *N.J.* 259, 264, 111 *A*.2d 261 (1955). Here, the Act's unquestioned purpose was to safeguard the interests of water quality, open space, recreation and conservation. The resoluteness with which the Legislature intended the moratorium to be enforced may be gathered from the narrow limitations placed upon exemptions. As we noted earlier, exemptions may be granted only where there is a "compelling public need," "extraordinary hardship," or where it can be shown that the conveyance will be "otherwise consistent with the purposes of this act." While the exemption under review is based on a finding that the conveyance will be consistent with the purposes of the act, the use of words like "compelling public need," and "extraordinary hardship" in the same sentence reveal the stringency with which the standard under which Hackensack seeks its exemption must be applied. The phrase "consistent with the purposes of this act" takes its color from "compelling public need" and "extraordinary hardship." "It is an ancient maxim of statutory construction that the meaning of words may be indicated and controlled by those with which they are associated." *Germann v. Matriss*, 55 *N.J.* 193, 220, 260 *A*.2d 825 (1970); *see also, Spirito v. New Jersey Real Estate Comm'n.*, 180 *N.J.Super.* 180, 184, 434 *A*.2d 623 (App.Div.1981); *Dept. of*

*Health v. Sol Schnoll Dressed Poultry Co.,* 102 *N.J.Super.* 172, 177, 245 *A.*2d 582 (App.Div.1968).

In our view, only the most searching inquiry and meticulous findings by the administrative agencies will suffice to demonstrate that the conveyance will be consistent with the purposes of the Moratorium Act. Our analysis, therefore, follows the premise that no applicant may be exempt from the moratorium unless it convincingly demonstrates that the purposes of the Act have been virtually assured.

We will briefly review the familiar principles governing administrative action and judicial review thereof.

■ Our role as an appellate court sitting in review of administrative determinations is to determine " 'whether the findings made could reasonably have been reached on sufficient credible evidence present in the record,' considering 'the proofs as a whole,' with due regard to the opportunity of the one who heard the witnesses to judge of their credibility." *Close v. Kordulak Bros.,* 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965) (quoting *State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964)); *see also Mayflower Securities v. Bureau of Securities,* 64 *N.J.* 85, 92–93, 312 *A.*2d 497 (1973). In *Application of Howard Savings Institution of Newark,* 32 *N.J.* 29, 52, 159 *A.*2d 113 (1960), the Supreme Court stated:

> It is axiomatic in this State by this time that an administrative agency acting *quasi-*judicially must set forth basic findings of fact, supported by the evidence and supporting the ultimate conclusions and final determination, for the salutary purpose of informing the interested parties and any reviewing tribunal of the basis on which their final decision was reached so that it may be readily determined whether the result is sufficiently and soundly grounded or derives from arbitrary, capricious or extra-legal considerations.

■ The Supreme Court in *Mackler v. Bd. of Education of City of Camden,* 16 *N.J.* 362, 370, 108 *A.*2d 854 (1954), noted three additional practical considerations for making findings of fact: "to prevent judicial usurpation of administrative functions, to help parties plan their cases for rehearing and for judicial review, and to keep administrative agencies within their

jurisdiction." Further, *quasi*-judicial administrative decisions must set forth "an 'analytical expression of the basis which, applied to the found facts, led to the holdings below.'" *Smith v. E.T.L. Enterprises*, 155 *N.J.Super.* 343, 348, 382 *A.2d* 939 (App.Div.1978) (quoting *Benjamin Moore & Co. v. City of Newark*, 133 *N.J.Super.* 427, 428, 337 *A.2d* 371 (App.Div.1975)). It is not only the duty of the agency to find the necessary facts, but also to explain its reasoning. In other words, it is obliged "... to tell us why." *Drake v. Human Services Dept.*, 186 *N.J.Super.* 532, 538, 453 *A.2d* 254 (App.Div.1982). "The findings should be adequately supported by the record and carefully explained...." *In the Matter of the Issuance of a Permit to Ciba–Geigy Corporation*, 120 *N.J.* 164, 180, 576 *A.2d* 784 (1990); *see also In re Application of Union Community Bank*, 144 *N.J.Super.* 39, 46, 364 *A.2d* 553 (App.Div.1976).

■ Finally, where the nature of the proofs lies beyond the understanding of lay persons, the agency must employ its expertise to assemble and interpret the facts so that they are comprehensible to a person of ordinary understanding. As the Supreme Court said within a somewhat different context in *Garden State Farms, Inc. v. Hoffman*, 46 *N.J.* 595, 600, 218 *A.2d* 637 (1966), "the agency should realize that a court cannot review something the court cannot understand. The record must speak in terms and details that strangers to the subject can comprehend."

## THE DEED RESTRICTIONS

■ In its initial presentation to the Watershed Property Review Board Hackensack proposed its so-called "Evergreen Plan" to deal with the problems of water quality, open space, conservation and recreation. Central to that plan was a restrictive covenant, which would be contained in the deed to Rivervale, dedicating these lands to continued use as golf courses. The restrictions, however, were subject to two important qualifications. The first was that the lands would remain in use as

golf courses only until Rivervale, its successors and assigns "are no longer willing or able to continue such use." Furthermore, the plan provided for termination of the restrictions in the event that either the 700–acre tract or the 287–acre tract became the subject of condemnation or were found by a court to be subject to the Moratorium Act. That proposal was rejected at the Review Board public meeting of December 14, 1989, because it did not offer "sufficient assurances of a permanent dedication of these properties for golf course use."

Responding to the December 14 denial, Hackensack submitted a modified proposal to the Board. In the Review Board's view, the modified deed restrictions, which were considered on January 12, 1990, provided "for the unqualified, permanent restriction of these properties to golf course use, and appurtenant country club uses, in perpetuity." The Board further opined that the conveyance to Rivervale would be subject to these uses as "indefeasible restrictions."

It is evident, however, that in acting so quickly to approve Hackensack's modified proposal, the Review Board did not adequately consider the import of reverter provisions in the proposed deed of conveyance which significantly undermine the permanence of the restrictions. These provisions are set forth in Schedules A and B as annexed to the proposed deed of conveyance. With respect to the Emerson and Pascack golf courses a reverter provision specifies that the restrictions "and each and every part thereof, shall be deemed void, *ab initio*" if, within a period of five years from the date of the deed, all or part of the 287 acres conveyed or the 700 acres previously conveyed in 1985 is taken or damaged by government action (a "taking event"), or if governmental action determines that the 700 acres previously conveyed was subject to the Moratorium Act ("a moratorium event"), or if such governmental action unreasonably precludes development or successfully challenges the ownership by Rivervale, its successors and assigns, to either the 287 acres or the 700 acres.

The restrictive covenants pertaining to the Haworth golf course include the same reverter language. In addition, they take account of the fact that the Haworth golf course is partially owned by a private concern by providing that in the event use of the privately-owned property is discontinued for a period of 90 days or "in the event any action or proceedings by any governmental entity for the taking of an interest in said adjacent property shall have occurred," then the owner of the property covered by the deed of conveyance may offer to sell the property to "the Borough of Haworth, County of Bergen and the State of New Jersey ... to be used for any purpose." It was also provided that should such an offer to sell or lease not be accepted within 180 days after receipt of the offer, the restriction on use "shall be deemed void *ab initio.*"

With the reverter provisions in place the restriction to golf course and country club use is neither permanent, unqualified nor indefeasible. In acting on the understanding that it met those conditions—which the Review Board had itself set as a basis for granting the exemption—the Board erred.

Respondents point out that in granting the exemption the Review Board was aware of the reverter provisions, noting in its decision and order of January 12, 1990, that the restrictive covenants were "subject only to the occurrence of the events specifically set forth in the annexed Schedules 'A' and 'B'." Ordinarily, we would defer to this statement by the Review Board as an expression that it granted the exemption with a complete understanding of what was contained in the schedules. In this case, however, the Board's ready acceptance of a modified proposal, which was so far contrary to what it apparently required to assure that the transfer would be consistent with the purposes of the Moratorium Act, must certainly be questioned.

The Board stated that the restrictive covenants contained in the modified proposal were "unqualified," "permanent," and "indefeasible." Clearly, they are none of these. In view of the

haste with which the Review Board acted on January 12, 1990, we can only conclude that it did not actually study the intricate language of the schedules or else did not grasp the wide range of circumstances which could operate to nullify the restrictions on future use of the property. Absent any explanation or discussion from the Review Board about the import of the reverter, it is impossible to determine what substantial credible evidence exists to support its determination to grant Hackensack an exemption from the moratorium.

The probable reason why the Review Board missed the significance of the impact which the reverter provisions had on the use restrictions is that, as a practical matter, when it convened the public hearing of January 12, 1990, it had already decided to grant the exemption. Had some meaningful public input been permitted, the fact that the restrictions were readily subject to nullification would in all likelihood have been noted. This conclusion finds support in a number of facts. The first is Hackensack's letter of January 5, 1990, to the Review Board and to the BPU in which it directly states that since the earlier meeting of December 14, 1989, the Review Board's counsel and staff had reviewed the proposed modified deed restrictions (although there had been no opportunity for public comment thereon) and found them satisfactory. Hackensack's assertion that the new proposal had been approved is borne out by Review Board counsel's opening statement at the outset of the January 12 hearing that the new deed restrictions require that the 287 acres be "permanently restricted to golf course and country club use in perpetuity," and by the fact that the Review Board President expressed her agreement therewith minutes later.[1] We note, also, that the comprehensive, carefully written decision and order of both agencies, which required some time to prepare, are dated January 12, 1990, the same day on which the hearing was held. Finally, we take account of the Review

---

[1] The entire meeting lasted approximately 30 minutes.

Board's stated intention to decide the application that day, notwithstanding the pleas for some additional time to study the new proposal by elected officials and other interested persons, before a new Review Board was appointed under the incoming administration.

In *613 Corp. v. State, Div. of State Lottery*, 210 *N.J.Super.* 485, 498–99, 510 *A.*2d 103 (App.Div.1986), we stated the following:

> [W]here the subject matter of a quasi-judicial adjudication encompasses concerns that transcend those of individual litigants and implicates matters of administrative policy, rulemaking procedures should be followed. *Metromedia, Inc. v. Director, Div. of Taxation*, 97 *N.J.* [313] at 331 [478 *A.*2d 742]; [ (1984) ] *see Texter v. Dept. of Human Services*, 88 *N.J.* 376, 386 [443 *A.*2d 178] (1982). These procedural requirements ensure fairness by providing public notice, an opportunity for all interested parties to be heard, full factual development and the opportunity for continuing comment on the proposed action before a final determination is made.

We enlarged upon this somewhat in *Matter of Organic Substances*, 239 *N.J.Super.* 407, 411, 571 *A.*2d 971 (App.Div.1990), in the following way:

> Where rule-making is concerned, the purpose of the procedure set forth in the A.P.A. is to give those affected by the proposed rule an opportunity to participate in a rule-making process not just as a matter of fairness but also as "a means of informing regulators of possibly unanticipated dimensions of a contemplated rule." *American Employers' Ins. v. Commissioner of Insurance*, 236 *N.J.Super.* 428, 434, 566 *A.*2d 202 (App.Div.1989). Thus, *N.J.S.A.* 52:14B–4(a)(3) requires an agency to allow "all interested persons reasonable opportunity to submit data, views, or arguments" prior to the adoption of any rule.

That Hackensack's application, touching upon the security of the environment, was a matter of urgent public concern is beyond doubt. The Review Board and the BPU were cognizant of the public's active interest and desire to be heard and participate in the proceedings. It is highly probable that had the public been given a reasonable opportunity to study and comment upon the modified Evergreen Plan it would have brought to the Review Board's attention the fact that, although the modification was an improvement over the first proposal, it still fell far short of satisfying the Review Board's requirement that the restrictions be unqualified and permanent.

Because the Review Board failed to explain its satisfaction with the modified Evergreen Plan's assurances of permanent and unqualified use restrictions in light of the reverter provisions and against the background of the Review Board's rejection of the earlier plan, and because it refused to allow a reasonable time for public study and comment on the proposed modified plan, its exemption granted under the Moratorium Act must be vacated.

## LACK OF A "DETAILED EXPLANATION" BY HACKENSACK

■ Section 4 of the Moratorium Act specifies the procedures to be followed by the BPU in reviewing a request by a public utility under *N.J.S.A.* 48:3–7 to convey watershed land to a grantee which is not subject to the jurisdiction of the BPU. Section 4b requires that public utilities submit to the BPU a document "setting forth a detailed explanation of the prospective use or uses of the land to be conveyed." No such document was ever submitted by Hackensack. Hackensack argues on this appeal that this deficiency does not render BPU's approval deficient since no use was ever contemplated other than for a golf course or country club purposes. As we explained, the use restrictions contained in the proposed deed were subject to reverter clauses which exposed the property to the possibility of development for numerous other uses. Disclosure of these contingencies, which threatened the permanence of the restrictions on use, were mandated under the statute, and Hackensack's disregard of its obligation to explain how these could operate to affect water quality, open space, recreation and conservation precluded BPU approval.

## LACK OF FINDINGS

■ Apart from problems flowing from the reverter provision, the decision and order of the Review Board is deficient in its findings of fact and in its statement of the reasoning process

which led to its result. Although the application for an exemption was made on the ground that the conveyance would be consistent with the purposes of the Moratorium Act, apart from perfunctorily acknowledging that the purpose of the moratorium was "the protection of public water supply," the decision fails to state what the purposes of the Moratorium Act are and what standards of consistency were applied in deciding whether the application was meritorious. Thus, we are left without any basis to determine whether the exemption was properly granted under the extremely restrictive standards of eligibility contemplated by the Legislature.

Without explanation, the decision directs that Hackensack shall maintain a 250–foot buffer zone around the 100 year flood level of the Oradell reservoir. The decision states only that the Board has considered certain reports, recommendations and testimony before it and on that basis recites in conclusory terms that the buffer zone standards applied "provide adequate protection of HWC's [Hackensack] water supplies in compliance with the Act." The anticipated function of the buffer zone and its relationship to water quality, open space, conservation and recreation is not elucidated, and therefore we cannot determine whether the Review Board's decision that a 250–foot buffer zone weighs in favor of determining that the transfer would be consistent with the purposes of the Moratorium Act is supported by the record.

Notably absent from the Review Board's decision is any comment upon the DEP's study report on the effectiveness of buffer zones in protecting the quality of drinking water which was filed, pursuant to § 3 of the Moratorium Act, in December 1989. That report emphasized that while a 250–foot buffer was necessary, alone it "will be of limited effectiveness in providing adequate water quality protection." It noted that a proper drinking water protection policy must address "impacts on water quality from all activities occurring throughout the watershed lands," *i.e.*, the entire land area from which rainfall

flows into the drinking water supply. Hence, the DEP strongly recommended that

> until such time as a multi-zone buffer regulatory program is in effect for watersheds associated with water supply reservoirs, tributaries, and intakes, no lands currently held for the protection of these water supplies be conveyed unless it can be demonstrated that the intended use of the property would not result in measurable, calculable or predictable degradation of the existing water quality of the water supply reservoir, tributary, or intake.

Bearing in mind that the Moratorium Act was structured to prevent the transfer of public utility watershed lands at least until the DEP could study and report upon the problems which might arise therefrom, it was imperative that in granting the exemption the Review Board analyze and comment upon the applicability of the DEP report which was in the BPU's hands in December 1989, several weeks before the exemption was granted. Its failure to do so detracts significantly from the sufficiency of the findings in support of the exemption.

## BPU's FAILURE TO REQUEST DEP ASSESSMENT

█ Section 4 of the Moratorium Act obliged the BPU, in reviewing Hackensack's request under *N.J.S.A.* 48:3-7 for permission to convey the 287 acres, to require the DEP "to assess the impact of the conveyance on the State's open space, conservation, and recreation requirements." This essential prerequisite to action by the BPU was completely overlooked. No such assessment was requested or provided. The absence of such a report assumes added importance in light of the DEP study report of December 1989, to which we referred above, which speaks in generally negative tones about conveying public utility-owned watershed lands until a multi-zone buffer regulatory program is put into effect. Here, the proposed deed of conveyance would permit an impervious cover on up to 15% of the total acreage, exclusive of golf cart paths, "for golf and country club purposes and such other uses customarily associated with golf and country clubs," except for hotels, residential housing units, and overnight accommodations paid for on a daily basis. Apart from anything else, the potential for 15%

impervious cover, plus golf cart paths, for golf course and "other uses" urgently demanded some comment by DEP as to what impact the conveyance would have on open space, conservation, and recreation requirements.

Respondents argue that the requirements of Section 4 of the Moratorium Act become activated only in connection with post-moratorium applications for relief. Their rationale presupposes that the Review Board, which includes the DEP Commissioner within its membership, will acquire the DEP assessment in the ordinary course of considering an application and that the Legislature did not intend to require a "duplicative" inquiry to be conducted by the BPU.

The terms of the Moratorium Act in this respect are clear and unambiguous. If the terms of Section 4 were not intended to apply during the moratorium, the Legislature would not have enacted it as part of the Moratorium Act. Nothing in the Act suggests otherwise.

## WAIVER OF BIDDING REGULATIONS BY BPU.

■ BPU regulations require that a public utility wishing to transfer property having a net book cost or fair market value of more than $100,000 must first advertise the property for bidding. *N.J.A.C.* 14:1–6.10(b). *N.J.A.C.* 14:1–1.2(b) states, however, that in "special cases and for good cause shown the Board [BPU] may relax or permit deviations from these rules." In this case, the BPU waived the necessity to advertise for bids in favor of an appraised price of 6.14 million dollars. However, it made no finding that the case was in some way "special," nor did it find "good cause." Its only explanation took the following form:

> HWC's [Hackensack] request for a waiver of the advertising requirements of *N.J.A.C.* 14:1–6.10(b) is granted, given that transfer has been approved pursuant to the independent appraisal procedure heretofore adopted by the Board in settling the ratepayers' claims to an equitable share of the fair market value of the property to be transferred, and given that HWC and Rate Council have expressly stipulated to the use of the appraisal procedure.

We are unable to extract any meaning from the foregoing statement. " 'Agencies must follow their own procedural rules.' " *In re Waterfront Dev. Permit,* 244 *N.J.Super.* 426, 432, 582 *A.*2d 1018 (App.Div.1990) (quoting 2 K. Davis, *Administrative Law Treatise* § 7.21 at p. 250 of Supp. (2d ed. 1976 & Supp.1989)). On the remand, if the BPU remains determined to waive the bidding requirements of its rules, it must first articulate a coherent basis for doing so.

■ The final point raised by appellants is lacking in merit. The fact that Hackensack's appeal from the BPU's determination of December 14, 1988, memorialized by written decision and order of February 15, 1989, was still pending on January 12, 1990, did not deprive the BPU of power to enter its decision and order of the latter date. Although the same docket numbers were used on both cases within the agency, the two proceedings were separate and distinct. The order denying relief on December 14, 1988, was entered for the reason that the BPU's authority to grant relief had been blocked by enactment of the Moratorium Act. The decision and order of January 12, 1990, was entered following a new proceeding before the Review Board and the BPU.

The orders of January 12, 1990, are vacated and the matters are remanded to the Watershed Property Review Board and the Board of Public Utilities for further proceedings not inconsistent with this opinion.