667 A.2d 193

CITY OF NEWARK, PLAINTIFF–RESPONDENT, AND THE STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, INTERVENOR–RESPONDENT, v. TOWNSHIP OF HARDYSTON, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued September 20, 1995—Decided November 13, 1995.

386

Before Judges LONG, MUIR, Jr. and BROCHIN.

*Kevin D. Kelly* argued the cause, for appellant (*Kelly, Gaus & Holub,* attorneys; *Mr. Kelly* on the brief).

*Philip S. Elberg* argued the cause, for respondent (*Medvin & Elberg,* attorneys; *Mr. Elberg* and *Edna Y. Baugh,* of counsel and on the brief).

*Caroline Vachier,* Deputy Attorney General, argued the cause, for intervenor-respondent (*Deborah T. Portiz,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Lorenza Evans,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

LONG, P.J.A.D.

The primary issue presented on this appeal is whether a provision of the Watershed Protection Act (*L.* 1988, *c.* 163 as amended by *L.* 1990, *c.* 19) which places limitations on the conveyance of watershed property continues to be valid. We have concluded that the moratorium is still in effect and is a factor to be considered in valuing watershed land for tax purposes.

*I*

The case arose out of the filing of four real property tax appeals by the City of Newark that contested the assessment of Newark's watershed property in the Township of Hardyston. The subject parcels are located in the Pequannock Watershed and are part of the 35,000 acre Newark watershed property located in Passaic, Sussex and Morris counties. They are designated as Block 20, Lot 32;[1] Block 36, Lot 9.01; Block 37, Lot 2; and Block 38, Lot 3 on the Hardyston Township tax map. The watershed designation arises out of the fact that rainfall travels from the parcels to the Pequannock River and then to the Charlottesburg Reservoir. The property is characterized by steep slopes, wetlands, rare species and soil limitations. These conditions, along with resulting environmental constraints, render less than fifteen percent of the land suitable for development.

---

[1] 20 acres at the North end of Block 20 are not in the watershed.

The property is located in the Minimum Impact Development zone of Hardyston which permits cluster development of detached single-family dwellings with a maximum density of .2 units per acre. The parties and the Tax Court agreed that the highest and best use of the four parcels is to develop them for single-family residential use as if they were one parcel. Newark has no plans for development.

At the heart of the appeals is Hardyston's contention (advanced in a motion for partial summary judgment in the Tax Court) that the moratorium in the Act should not be considered in determining the true value of Newark's watershed property. Seven other taxing districts joined the motion in support of Hardyston, and the Attorney General intervened on behalf of the Department of Environmental Protection (DEP) in defense of the continued vitality of the moratorium. Judge Pizzuto denied Hardyston's motion, affirming the continued viability of the Act. Thereafter a trial was held before Judge Lasser who determined the true value and proper assessments of the four parcels, discounting the value because of the moratorium. Hardyston appeals.

## II

It is undisputed that the purpose behind the passage of the Watershed Protection Act was to "safeguard the interests of water quality, open space, recreation and conservation." [*In re Petition of Hackensack Water Co. to the Watershed Property Review Bd.*, 249 *N.J.Super.* 164, 173, 592 *A.*2d 250 (App.Div.), *certif. denied*, 127 *N.J.* 551, 606 *A.*2d 364 (1991).] The specific impetus for the Act was the threatened transfer of particular watershed property in Bergen County which alerted the Legislature to the need for watershed protection across the board. The vehicle chosen was a moratorium on the transfer of watershed lands, to permit time for the DEP to study and report on the need for and means to secure watershed protection. Included in the proposed study was an evaluation of the effectiveness of establishing buffer zones around

public water supply reservoirs for the purpose of protecting drinking water quality.

DEP was further directed to transmit its study, upon completion, to the Governor, the BPU and the Legislature. The Act provided for exemptions from the moratorium, but only upon a showing "that there is a compelling public need for the conveyance of the property, that the denial of the exemption would result in extraordinary hardship, or that the sale or development of the watershed property is otherwise consistent with the purposes of this act." Applications for exemptions under the Moratorium Act were made subject to consideration by the Review Board, which was created by the Act, consisting of the Commissioner of DEP, the Commissioner of the Department of Community Affairs and the President of the BPU.

.    .    .    .    .    .    .    .

According to a news release from the office of Governor Kean dated November 17, 1988, "[t]he legislation was introduced to protect 287 acres in Bergen County owned by the Hackensack Water Company from sale and development." The release also quoted the Governor as stating that "[p]reservation of open space is a top environmental priority of this Administration."

.    .    .    .    .    .    .    .

The resoluteness with which the Legislature intended the moratorium to be enforced may be gathered from the narrow limitations placed upon exemptions.... [E]xemptions may be granted only where there is a "compelling public need," "extraordinary hardship," or where it can be shown that the conveyance will be "otherwise consistent with the purposes of this act." While the exemption under review is based on a finding that the conveyance will be consistent with the purposes of the act, the use of words like "compelling public need," and "extraordinary hardship," in the same sentence reveal the stringency under which Hackensack seeks its exemption must be applied.

In re Petition of Hackensack Water Co. to the Watershed Property Review Bd., supra, 249 N.J.Super. at 169–170, 173, 592 A.2d 250.

The 1988 version of the Act stated:

For a period of eighteen months commencing on the effective date of this Act, no municipality, municipal utilities authority or public utility shall convey any land utilized for the purpose of the protection of a public water supply on the effective date of this Act....

The DEP undertook preparation of its report in conjunction with the Cook College, Department of Environmental Resources (Department). In the *Report to Governor Thomas H. Kean, the New Jersey State Legislature, and the Board of Public Utilities: Evaluation and Recommendations Concerning Buffer Zones Around Public Water Supply Reservoirs* (December 1989), the

Department found that buffer zones around water supply reservoirs provide some protection for drinking water quality. The *Report* further urged application of multi-zone buffers around both water supply reservoirs and their contributing tributaries to enhance water quality protection. *Report, supra,* at i. Also recommended was further legislation requiring the adoption of regulations establishing appropriate and effective buffer zones for all watersheds associated with water supply reservoirs, tributaries and intake waters. *Ibid.* Finally, the Department recommended,

> that until such time that a multi-zone buffer regulatory program is in effect for watershed associated with water supply reservoirs, tributaries and intakes, *that no lands currently be conveyed unless it can be demonstrated that the intended use of the property would not result in measurable, calculable or predictable degradation of the existing water quality of the water supply reservoir, tributary, or intake waters.*
>
> [*Ibid.* (emphasis added) ]

Based on this report, the Department recommended that the Legislature adopt a system-wide set of controls with a broader scope than buffer zones alone.

In 1990, when the eighteen month period referred to in the 1988 Act was about to expire, the Legislature adopted *L.* 1990, *c.* 19 § 1, which amended the statute to read in part:

> No municipality, municipal utilities authority or public utility shall convey any land utilized for the purpose of the protection of a public water supply prior to the adoption by the Department of Environmental Protection of the rules and regulations establishing buffer zones for all watershed lands associated with public water supply reservoirs for the purpose of protecting drinking water quality required pursuant to the "Watershed Protection Act," *P.L.* ——, *c.* ——.... (now before the Legislature as Senate Bill No. 2339 of 1990).

The Legislature specifically acknowledged the DEP report in a statement to a companion bill to the moratorium extension:

> The Department of Environmental Protection recently completed the study evaluating the effectiveness of establishing buffer zones around public water supply reservoirs for the protecting drinking water quality required pursuant to section 3 of *P.L.* 1988, *c.* 163. In its report to the Governor, the Board of Public Utilities, and the Legislature, the DEP recommends that the Legislature enact legislation that would require the department to adopt rules and regulations establishing appropriate and effective buffer zones for all watersheds associated with water supply reservoirs, tributaries, and intakes. Further, the department strongly

recommends that the moratorium should continue until the buffer zone regulatory program is in place.

[Reprinted at *N.J.S.A.* 48:3–7].

Neither Senate Bill Number 2339 of 1990, nor any similar legislation was ever enacted although the Legislature has continued to wrestle with the problem. In the 1992–1993 legislative session, for example, nine watershed bills were introduced. Currently there are a number of bills regarding this issue. One bill would extend the moratorium (SB 808) and three would repeal it. (SB 1393, AB 2218, AB 1003). According to a recent newspaper article, legislators are working on a compromise to continue the moratorium while aiding tiny municipalities, such as Hardyston, that have been forced to pay relatively large tax refunds because of it. At a September 13, 1995, legislative hearing on the watershed moratorium issue, a representative from DEP declared the Department's opposition to "simply lifting the watershed moratorium at this time."

## III

On appeal, Hardyston claims that the moratorium on transfer of watershed property under the Act has expired by its own terms as a result of the fact that neither Senate Bill No. 2339 of 1990 nor any similar legislation was ever enacted. Newark and the Attorney General counter that the moratorium was in effect on each of the assessment dates in question because a law designed to deal with important public policy goals must remain in effect if, as here, such an objective was reflected in the legislative intent.

In ruling on this issue, Judge Pizzuto stated:

Given that the legislature was concerned with the protection of such an important resource as the public water supply in choosing between the alternatives that the legislature intended its moratorium to lapse or that the legislature intended its moratorium to continue for a reasonable period of time until a permanent program could be implemented I have very little difficulty in concluding that the legislature wished the moratorium to continue until in cooperation with the executive branch it had finished the job.

[T]he legislature has expressed its intention ... to continue the moratorium in place subject to the case by case exemption provisions controlled by adequately

expressed standards until such time as the permanent program providing for the establishment of buffer zones can be completed. While there may ultimately be some limitation on the capacity of the legislature to continue an interim arrangement of this kind in effect I do not believe that in the circumstances of this case there is any basis to conclude that the ... limitation should be thought to apply here.

[T]he question continues to be under active review in both the executive and the legislative branches.

We agree with this analysis.

■ It is undisputed that a statute may be made contingent upon the happening of a future event. *State v. Strong Oil Co., Inc.,* 105 *Misc.*2d 803, 433 *N.Y.S.*2d 345, 348 (Sup.Ct.1980) (holding that legislation designed to discourage price gouging by merchants of home heating oil during periods of "abnormal disruption of the market" did not automatically terminate at the end of the heating season which the Legislature had declared "abnormally disrupted" at the time the legislation was enacted), *appeal dismissed,* 87 *A.D.*2d 374, 451 *N.Y.S.*2d 437 (1982). What is at issue in this appeal is whether that statute remains valid if the contingency does not occur.

■ Generally, a remedial statute will be construed to include cases within its spirit or reason, although technically outside its letter, when necessary to effectuate the legislative intent. 82 *C.J.S. Statutes,* § 388 at 921 (1953). Where the drafters of a statute did not consider or contemplate a specific situation, a court should interpret the enactment consonant with the probable intent of the drafters, had the situation at hand been anticipated. *AMN, Inc. v. South Brunswick Tp. Rent Leveling Bd.,* 93 *N.J.* 518, 525, 461 *A.*2d 1138 (1983). In such a situation, the interpreting court should not rely on "literalisms, technicisms or the so-called formal rules of interpretation." *Jersey City Chapter of the Prop. Owner's Protective Ass'n v. City Council of Jersey City,* 55 *N.J.* 86, 100, 259 *A.*2d 698 (1969). Rather, the court should rely on the breadth of the objectives of the legislation and the common sense of the situation, in order to further the legislative purpose. *Ibid; Matlack v. Burlington Cty. Bd. of Chosen Freeholders,* 194 *N.J.Super.*

359, 362, 476 *A.*2d 1262 (App.Div.), *certif. denied,* 99 *N.J.* 191, 491 *A.*2d 693 (1984).

■■■ In addition, with respect to amendatory legislation, courts will not construe a statute in a manner that will render the amendments futile and abortive if that result can possibly be avoided. *Evans v. Ross,* 57 *N.J.Super.* 223, 229, 154 *A.*2d 441 (App.Div.), *certif. denied,* 31 *N.J.* 292, 157 *A.*2d 362 (1959). In ascertaining the meaning of amendatory language, the court must look to the prior law, the matters deemed to require correction, and the remedy enacted; courts will not construe a clause in a statute in such a fashion as to charge the Legislature with deliberately rendering impotent the clear and unambiguously expressed intention of the whole act. *Asbury Park Press v. City of Asbury Park,* 19 *N.J.* 183, 196, 115 *A.*2d 564 (1955).

By enacting the 1990 legislation near the expiration of the eighteen-month moratorium, the Legislature clearly intended the moratorium to continue. To be sure, the Legislature specifically referred to legislation then under consideration in the 1990 amendment. But a fair reading of the Act indicates that that reference was only for the purpose of spelling out authorization pursuant to which the DEP would enact "rules and regulations establishing buffer zones for all watershed lands." The adoption of the rules and regulations was the pivotal action on which the continuing vitality of the moratorium depended.

The Legislature is still wrestling with the problem of watershed protection. This issue is politically sensitive because it pits a matter of general concern (protection of watershed land and the water sources) against both the property rights of watershed owners and the taxing interests of municipal entities in which watershed land exists. Thus, the fact that no easy resolution has occurred is neither a surprise nor a signal that the moratorium was meant to expire.

■■■ The Legislature's objectives remain the same today as they were when the Watershed Protection Act was conceived.

The primary objective is the protection of the watershed which has been designated "a matter of grave concern" and "essential to the health, safety and well-being of all the citizens of New Jersey." The second objective is creating a comprehensive statewide policy while paying careful attention to regional differences, relative population density, levels of growth and development, and similar land use considerations in the implementation of a "multi-zone buffer approach to statewide watershed management." When the Legislature referenced S2339 in the moratorium extension, it anticipated that watershed protection would go forward with that bill as the means to achievement. That such protection did not occur, does not mean that all the activity which has taken place up to this point should be vitiated. Simply because the Legislature has not entirely completed its task does not mean that the incremental steps taken to date are unreasonable. *See Jamouneau v. Harner,* 16 *N.J.* 500, 518, 109 *A.*2d 640, *cert. denied* 349 *U.S.* 904, 75 *S.Ct.* 580, 99 *L.Ed.* 1241 (1955); *Reiser v. Pension Commission, Passaic Cty.,* 147 *N.J.Super.* 168, 180, 370 *A.*2d 902 (Law Div.1976). An interpretation of the Act concluding that the moratorium has expired, would fly in the face of common sense, omit consideration of the breadth and importance of the legislative objectives, and render the 1990 amendment futile. While the moratorium legislation was not a model of draftsmanship, it is plain to us that the Legislature intended the limit on the transfer of watershed lands to continue until a statewide watershed system is in place as recommended by the Department's *Report.* If the Legislature did not so intend, or if it has a new view of watershed protection, it is free to say so. We thus affirm Judge Pizzuto's conclusion that the moratorium in the Watershed Act continues to be in force and effect.

## *IV*

We turn next to Hardyston's challenge to Judge Lasser's decision as to the true value and proper assessments of the parcels. In his opinion, Judge Lasser adopted Judge Pizzuto's

finding that the moratorium continues. Hardyston argued and continues to argue that the moratorium does not affect the value of watershed land. Judge Lasser disagreed:

> The statute exists and would not be ignored by prospective purchasers and sellers. Therefore, I find that as of each of the assessing dates for the tax years 1991 through 1994, there should be a discount from the market value of the property to reflect the effect of the existence of the moratorium on the market for watershed property. This discount reflects the possibility of obtaining approval from the Watershed Review Board within a reasonable period of time as well as the costs which must be incurred during the period and the risk of restrictions on the use of the land. I find that this discount should be 10% for a three year period or a discount rate of .751315.

We affirm this conclusion. Clearly, the moratorium is not the type of temporary restraint which only creates a transitory absence of market. As such, it must be considered in determining true value. *Newark v. Township of Jefferson,* 13 *N.J. Tax* 217 (App.Div.1992), *certif. denied,* 133 *N.J.* 430, 627 *A.*2d 1137 (1993).

Hardyston's exhaustion argument is equally unpersuasive. There is neither legal nor logical support for the notion that, in order to establish a reduction in value of its property as a result of the Watershed Act, a taxpayer must first apply to the Review Board for an exemption from the moratorium, even where the taxpayer has no intention of transferring the land.

We turn finally to Hardyston's constitutional arguments. Because they were not raised below, we need not address these issues. *Nieder v. Royal Indemnity Ins. Co.,* 62 *N.J.* 229, 234, 300 *A.*2d 142 (1973). However, we choose to dispose of them summarily. Hardyston first claims that the Act is unconstitutionally vague. Hardyston lacks standing to raise this challenge because Newark is the entity which is restricted from conveying its land and is thus the only party with such standing. Even if Hardyston had standing, the law is not void for vagueness. It expressly proscribes the unfettered conveyance of watershed land by municipalities, municipal utilities authorities or public utilities prior to the adoption of certain rules and regulations by the DEP. That those rules have not yet been adopted does not render the

law vague; rather, that failure raises a question as to the moratorium's continued validity, which we have previously addressed.

As to Hardyston's overbreadth argument, we observe that the overbreadth doctrine is generally restricted to limitations on First Amendment rights which are not present here. *State v. Lee,* 96 *N.J.* 156, 165, 475 *A.*2d 31 (1984); *Town Tobacconist v. Kimmelman,* 94 *N.J.* 85, 462 *A.*2d 573 (1983). More importantly, the statute as written does not "extend too far." *Town Tobacconist, supra,* 94 *N.J.* at 125–26, 462 *A.*2d 573. The Watershed Protection Act does not reach beyond its intended objective of ensuring the quality of all public drinking water. The fact that the Tax Court held that the moratorium could be considered in determining the value of municipally owned watershed property simply does not implicate the constitutional doctrine of overbreadth.

Finally, we reject Hardyston's special legislation claim. Hardyston's suggestion that the Act singles out watershed property for special tax treatment is plainly wrong. What is involved here is a government-imposed restriction, contained in a uniform act, which may be considered in arriving at the true value of property. This does not constitute special tax treatment within the meaning of *New Jersey State League of Municipalities v. Kimmelman,* 105 *N.J.* 422, 522 *A.*2d 430 (1987).

Affirmed.