KUSKIN, J.T.C.
The City of Jersey City (hereinafter “Plaintiff’) appeals the 1991 through 1996 local property tax assessments on its water supply facility located in the Township of Parsippany-Troy Hills (hereinafter “Defendant”). The property contains 1,174.66 acres *507 comprising four tax lots. The assessments under appeal are the following:
Block/Lot Annual Assessments for 1991-1995 1996 Assessments
400/1 $11,162,300 $7,826,000
450/1 $ 45,000 $ 45,000
450/2 $ 170,600 $ 170,600
494/8 $ 1,114,400 $ 488,400
Totals $12,492,300 $8,530,000
The applicable ratios and common level ranges under Chapter 123, N.J.S.A. 54:l-35a(a) and (b), are:
Year Ratio Common Level Range
1991 52.38% 44.52% - 60.24%
1992 54.60% 46.41% - 62.79%
1993 54.54% 46.36% - 62.72%
1994 56.40% 47.94% - 64.86%
1995 57.23% 48.65% - 65.81%
1996 57.8 49.16% - 66.52%
Block 400, Lot 1 contains, 1,116.14 acres of which 710.2 acres are submerged under approximately 7,300,000,000 gallons of water. The balance of the lot consists of a buffer area surrounding the body of water, wetlands, wetlands transition areas and developable upland. One thousand seventy seven and fourteen one hundredth acres are located in the R-3 Zone in which the principal permitted use is single family residences on lots having a minimum size of 15,000 square feet with townhouse development, at a density of 2.5 units per acre, as a conditional use. Twenty six and three tenths acres are located in the R-l Zone in which the principal permitted use is single family residences on lots having a minimum size of 40,000 square feet, and 12.7 acres are located in the SED-3 Zone in which the principal permitted uses are offices and scientific research laboratories on lots having a minimum area of three acres. The lot also contains a dam and three storage buildings.
*508 Lot 1 in Block 450 contains 5.2 acres and Lot 2 in such block contains 3.79 acres, all located in the SED-3 Zone. Both lots are vacant and unimproved. Block 494, Lot 8 contains 49.53 acres located in the R-l Zone, and is improved with a water filtration plant.
Construction of the reservoir and necessary piping (extending some twenty-two miles to the City of Jersey City) was completed, and the water was “turned on,” on May 23, 1904. Mayor and Aldermen of Jersey City v. Flynn, 74 N.J.Eq. 104, 109, 70 A. 497 (Ch.1908), modified sub nom. Mayor and, Aldermen of Jersey City v. Jersey City Water Supply Co., 76 N.J.Eq. 607, 76 A. 3 (E. & A.1910). The following description of such construction appeared in an article entitled “Work Progressing on Jersey City’s Water Works” in the September 5, 1902 issue of The Boonton Times [hereinafter “Jersey City Water Works”]:
A number of handsome farmhouses that now dot the roadside between here and Parsippany have been sold to the water company and will have to be tom down, and hundreds of acres of as fine farm land as there is in the State will be submerged. The village of Parsippany will practically be wiped out. Old Boonton, about a mile from Boonton, whose history dates back to Revolutionary times, will be completely buried under water, and several old landmarks will be razed to the ground.
It was here that the first iron mills in the United States were set in motion, and when cannon balls were made for the Revolutionary Army the ore used in the mills was brought from the mountains in saddle bags to be smelted and forged into nails, cannon balls, etc. The old stone mill, which in late years was used as a paper mill, marks the spot where the old iron mill stood. On the other side of the road stands an old Revolutionary house, which was built 140 years ago and which has sheltered Washington and other officers of Revolutionary fame.
During the excavations for the dam a large number of fossil fishes, imbedded in the stone, were found thirty feet under the surface, and there now can be seen the footprints in the stones where the ichthyosauris walked on the shores of some prehistoric lake, older than Lake Passaic or the Bergen Hills. The excavations have been a mine of information to geologists.
In fact the new reservoir will occupy the site of a lake that, according to Professor Gratacap, of the American Museum of Natural History of New York, existed some 15,000,000 years ago, more or less. The lake, when completed, will add to the beauty of picturesque Boonton, for from its hills it will be plainly seen in the valley below.
*509 Because of the characteristics of the subject property, determining the value of the property for tax assessment purposes requires resolution of the following issues:
1) the valuation methodology to be applied to the underwater portion and surrounding buffer area of Block 400, Lot 1;
2) the quantity of developable acreage in each zone on each lot, and whether the buffer area surrounding the body of water on Block 400, Lot 1 should be deemed to be 250 feet or 300 feet in width and to what extent steep slopes inhibit development of portions of the property; and
3) whether and to what extent the value of dévelopable land should be reduced by reason of the moratorium on conveyances imposed by the Watershed Protection Act, L.1988, c. 163, as amended by L.1990, c. 19, as such Act is interpreted in Newark v. Hardyston Tp., 285 N.J.Super. 385, 667 A.2d 193 (App.Div.1995), certif. denied, 143 N.J. 518, 673 A.2d 277 (1996).
The first issue is, by far, the most significant because it affects approximately 90% of the dollar amount of assessments under appeal and involves a fundamental conflict between the valuation approaches used by the parties. This conflict arises from the parties’ differing interpretations of N.J.S.A. 54:4-3.3 pursuant to which the subject property was assessed. This statute provides in relevant part as follows:
The lands of counties, municipalities, and other municipal and public agencies of this State used for the purpose and for the protection of a public water supply shall be subject to taxation by the respective taxing districts where situated, at the taxable value thereof, without regard to any buildings or other improvements thereon, in the same manner and to the same extent as the lands of private persons, but all other property so used shall be exempt from taxation.
[N.J.S.A. 54:4-3.3, L.1910, c. 118.] The statute’s purpose was to eliminate the exemption from taxation previously enjoyed by lands “used for the purpose and for the protection of a public water supply.” Other municipal lands used for public purposes remained exempt, and, therefore, the statute accorded “special tax treatment” to publicly-owned water supply lands. East Orange v. Livingston Tp., 102 N.J.Super. 512, 529, 246 A.2d 178 (Law Div.1968), aff'd, 54 N.J. 96, 253 A.2d 546 (1969).
Both parties assert that, as of each of the relevant valuation dates (October 1 preceding each year under appeal), then current and reasonably foreseeable environmental laws and regulations prohibited, and would prohibit, draining the water from Block 400, Lot 1 and reclaiming the land for development. Both parties *510 agree, therefore, that, for purposes of these appeals, such body of water should be considered permanent. Based upon their respective interpretations of the phrases “without regard to any buildings or other improvements thereon” and “in the same manner and to the same extent as the lands of private persons” appearing in N.J.S.A. 54:4-3.3, the parties reach dramatically different valuation conclusions from their shared premise of a permanent body of water.
Plaintiff asserts that: (a) under the statutory language requiring that the subject property be assessed “in the same manner and to the same extent as the lands of private persons,” Block 400, Lot 1 must be assessed as if it were a privately-owned lake not utilized for water supply purposes; and (b) the phrase “without regard to any buildings or other improvements thereon” refers to the dam and storage buildings (as well as the filtration plant on Block 494, Lot 8) and does not refer to the water included in the reservoir. Plaintiffs appraiser, accordingly, excluded from consideration a highest and best use as a water supply facility, determined that the highest and best use for the land under water and surrounding buffer land, “as the lands of private persons,” was for conservation and open space use, and so valued such lands.
Defendant asserts-that: (x) the statutory reference to “private persons” does not preclude valuation of the body of water and buffer area as a reservoir (presumably owned by a private water company); and (y) under the statutory requirement that the land be valued “without regard to any buildings or improvements thereon,” the water is an “improvement” and must; therefore, be disregarded in valuing the underlying land. Defendant’s appraiser, accordingly, determined that the highest and best use for plaintiffs entire property, including the land under water and surrounding buffer area, was as a reservoir, but that the purchase price to acquire the land for this use would be based on the value of the land for development as zoned (ie., for residential development or for office or research laboratory development). The appraiser valued the land as so zoned, ignoring the presence of the water.
*511 These widely divergent interpretations and applications of N.J.S.A. 54:4-3.3 led, inevitably, to widely divergent value conclusions. Plaintiff valued Block 400, Lot 1 at $4,500,000 for each year under appeal. Defendant valued such lot at $30,835,000 for 1990 and $31,760,000 for 1991 and each succeeding year under appeal.
Because of the fundamental conflict between the two valuation approaches, I must, in valuing the underwater portion and surrounding buffer area of Block 400, Lot 1, select the approach advanced by one of the parties and rely on that approach to the exclusion of the other. Decisional law involving appeals of property tax assessments on both municipally-owned water facilities and privately-owned water supply facilities provides the basis for making such selection. Of primary importance are decisions of the New Jersey Supreme Court which interpret the statutory provisions governing assessments of such facilities and establish substantive differences between the valuation methodology permissible for publicly-owned water supply facilities and the methodology permissible for privately-owned facilities. As set forth above, publicly-owned water supply facilities are taxed pursuant to N.J.S.A. 54:4-3.3. Privately-owned facilities are taxed pursuant to N.J.S.A. 54:30A-52 and not pursuant to N.J.S.A. 54:4-3.3. N.J.S.A. 54:30A-52 provides in relevant part as follows:
All the real estate as herein defined, ... owned or held by any taxpayer shall be assessed and taxed at local rates in the manner provided by law for the taxation of similar property owned by other corporations or individuals, ...
“Real estate” is defined in N.J.S.A. 54:30A-50(b) as “lands and buildings, but it does not include ... pipes, conduits, bridges, viaducts, dams and reservoirs (except that the lands upon which dams and reservoirs are situated are real estate), ...”
The differences between valuation methodologies applicable to publicly-owned and privately-owned water supply facilities result primarily from the highest and best use analysis for each type of facility. For property tax assessment purposes, property must be valued at its highest and best use. Ford Motor Co. v. Edison Tp., 127 N.J. 290, 300-01, 604 A.2d 580 (1992); Inmar Assocs., Inc. v. Edison Tp., 2 N.J.Tax 59, 64 (1980). Highest and best use is defined as:
*512 the reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value.
[Appraisal Institute, The Appraisal of Real Estate 297 (11th ed.1996).]
This definition has been accepted and adopted by the New Jersey courts in property tax appeals involving a wide variety of property types, including water supply facilities. The Supreme Court has, however, imposed restrictions on the highest and best use analysis of publicly-owned water supply facilities under N.J.S.A. 54:4-3.3, which restrictions are not applicable to the analysis of privately-owned facilities under N.J.S.A. 54:30A-52.
The seminal decision as to publicly-owned water supply facilities is Newark v. West Milford Tp., 9 N.J. 295, 88 A.2d 211 (1952), in which the City of Newark challenged the tax assessment on 18,548 acres of watershed property, including a reservoir, located in the Township of West Milford. The Court’s opinion does not indicate the number of acres under water and does not distinguish between “watershed” and “underwater” land. The record on appeal reveals that the property under appeal included 1,197 underwater acres. “Excerpts Taken From the Testimony of [George W.] Rude,” Appendix to Brief for Defendant-Appellant, Township of West Milford, Newark v. West Milford Tp. in 161 Supreme Court of New Jersey 52q (1951-52).[1] The Court defined the “purpose and intent” of N.J.S.A. 54:4-3.3 as:
to distribute the tax burden of the taxing district equably between the municipality owning watershed lands and the lands of the other taxpayers of the district. [The statute] subjects such lands to taxation at their true value on the same terms and conditions as the lands of the other taxpayers in the district are subjected to. The scheme is essentially different from the method of taxing property of private companies.
The statute impliedly prohibits an assessment of such lands as part of an integrated utility with the resultant increment to the value of such lands because of their integrated use. An assessment on such a basis necessarily would result in a higher valuation and would burden the municipality owning the watershed property with a disproportionate share of the tax burden of the taxing district.
[Newark v. West Milford Tp. supra, 9 N.J. at 301-02, 88 A.2d 211 (citations omitted).]
*513 Further explanation of the valuation principles set forth in Newark v. West Milford Tp. appeared in In re Appeal of East Orange, 80 N.J.Super. 219, 193 A.2d 377 (App.Div.), certif. denied, 41 N.J. 200, 195 A.2d 468 (1963), which involved the valuation of vacant lands owned by the City of East Orange and located in the Township of Livingston. The lands contained an underground aquifer that served as a water supply source for residents of East Orange.
The central concept in Newark v. West Milford, is that N.J.S.A. 54:4-3.3 precludes a valuation approach based upon any special factor of value inhering in the property as devoted to integrated water utility purposes because other lands in the municipality are not being used for such purposes and the municipally-owned water supply lands must be assessed in the same manner as comparable land of the generality of real estate taxpayers in the taxing district. Therefore since, as indicated above, the influence upon the assessable valuation of the lands of taxpayers generally of the fact that they contained subterranean water-bearing strata would in ordinary course exert very little influence on the true or market value of the property, the same conclusion must be arrived at for purposes of determining the true or assessable value of the property of East Orange in this case.
[Id. at 234, 193 A.2d 377.]
The Appellate Division also held that such water supply property, just as all other types of property, must be valued “in the actual condition in which the owner holds it,” id. at 230, 193 A.2d 377 (citations omitted), taking into account the property’s “fitness and availability ... for particular uses ... rather than the fact of actual use as such.” Id. at 231, 193 A.2d 377 (citations omitted).
In Hackensack Water Co. v. Old Tappan Bor., 77 N.J. 208, 390 A.2d 122 (1978), the Supreme Court set forth the permissible valuation methodology in valuing water supply lands owned by a private utility company. Of the 940.805 acres under appeal, 516.654 acres were under water. The balance of the property was dry upland. Both parties assumed that the highest and best use of the entire 940.805 acres was for residential development and valued the land on that basis. The proofs demonstrated, however, that, in order to make the underwater land usable for residential development, a dam would have to be dismantled, the water drained, and then millions of cubic yards of fill dumped into the resulting basin. The cost of performing this work would far *514 exceed the fair market value of the reclaimed residential land. The Court rejected valuation based on a residential highest and best use.
Since property owners cannot be charged with the cost of restructuring their property (property should be valued in the actual condition in which the owner holds it), the Division’s finding that financially it was not feasible to develop the property for residential use was fully supportable in the record.
[Id. at 213-14, 390 A.2d 122 (citations omitted).]
After noting that “property valuation should have some relationship to reality,” the Court determined that: “[T]he reality of the matter is that the land is useful as a reservoir. Therefore, it would have been proper to consider the actual highest and best use of the land, namely as a reservoir in conjunction with the operation of a utility water system.” Id. at 214, 390 A.2d 122. In a footnote to this determination, the Court stated that Newark v. West Milford Tp., supra, and other eases construing N.J.S.A. 54:4-3.3 “do not control us here.” Hackensack Water Co. v. Old Tappan Bof., supra, 11 N.J. at 214 n. 1, 390 A.2d 122.[2] In such footnote, the Court also commented that valuing the Hackensack Water Co. property based on use as a reservoir was consistent with the suggestion in In re Appeal of East Orange, supra, 80 N.J.Super. 219, 193 A.2d 377, that, if the evidence therein had demonstrated that the value for water supply purposes of municipally-owned land with an underground aquifer “compared favorably with the value for other purposes, such as residential development, evaluation of the land from the standpoint of its availability *515 as a water supply would have been appropriate.” Hackensack Water Co. v. Old Tappan Bor., supra, 77 N.J. at 214 n. 1, 390 A.2d 122.
The Supreme Court concluded that the comparable sales approach and income approach “are not compatible with the unique problem posed here,” id. at 215, 390 A.2d 122, because the operations of the water supply utility, including sale of the property and income generated, were “subject to comprehensive regulation by the Board of Public Utility Commissioners.” Id. at 212, 390 A.2d 122 (citation omitted). The Court then determined that the original cost of the land was included in the rate base for purposes of setting the rates chargeable by Hackensack Water Co. and held: “The original cost at least bears some relationship to the value of the reservoir land and it is appropriate to rely upon it in the absence of any other evidence.” Id. at 217, 390 A.2d 122 (footnote and citation omitted). The Court indicated that consideration of a trending of the original cost would be appropriate, but the record contained no evidence to permit such trending analysis.
Tax Court decisions valuing municipally-owned water supply facilities have reached conflicting conclusions as to the applicability and meaning of Old Hackensack Water Co. v. Old Tappan Bor., supra, and Newark v. West Milford Tp., supra, 9 N.J. 295, 88 A.2d 211. In Newark v. Cedar Grove Tp., 7 N.J.Tax 66 (1984), the Tax Court, after noting that, under Hackensack Water Co. v. Old Tappan Bor., municipally-owned lands cannot be valued as part of an integrated water supply facility, nevertheless determined, based on that case that the highest and best use of underwater land included in such a facility was as a reservoir. The Tax Court then proceeded to value that land for residential development as zoned because “[i]n a comparable situation involving the valuation of a golf course, it was recognized that where the highest and best use of land was as a golf course, and where the zoning also permitted residential construction, the cost approach to value required the land to be first valued as unimproved land by comparing it with raw land similarly zoned.” Newark v. Cedar Grove Tp., supra, 7 N.J.Tax at 75 (citations omitted).
*516 In Newark v. West Milford Tp., 7 N.J.Tax 35 (1984), the defendant Township of West Milford contended that the same 18,548 acres of watershed lands at issue in Newark v. West Milford Tp., supra, 9 N.J. 295, 88 A.2d 211, should be valued at a highest and best use of “ ‘a continuation of its use for water supply purposes.’ ” Id. at 43.
... West Milford’s position in this litigation was that Newark had no intention of selling any of the property, that “it is highly speculative that any use could be advanced to overcome the essential water supply purpose of the vast bulk of acreage under consideration,” and that “property valuation should have some relationship to reality,”. . . .
[Id]
The Tax Court rejected West Milford’s approach and held that (i) Hackensack Water Co. v. Old Tappan Bor. did not “stand for the proposition that the highest and best use of a municipally-owned property can be as a watershed,” Newark v. West Milford Tp., supra, 7 N.J.Tax at 46, and (ii) Hackensack Water Co. v. Old Tappan Bor. was inapplicable because its focus was on land under water whereas the lands before the Tax Court were almost entirely uplands,[3] and because “Newark is obviously not a privately-owned water company and is not as tightly regulated as the Hackensack Water Company with regard to buying and selling its lands in the marketplace.” Newark v. West Milford Tp., supra, at 47.
The inconsistency between the Tax Court’s decision in Newark v. West Milford Tp. and the Tax Court’s decision in Newark v. Cedar Grove Tp. cannot be explained on the basis that the former decision involved watershed lands and the latter involved underwater lands. The inconsistency is the result of fundamentally different interpretations and applications of Newark v. West Milford Tp., supra, 9 N.J. 295, 88 A.2d 211, and Hackensack Water Co. v. Old Tappan Bor., supra, 77 N.J. 208, *517 390 A.2d 122. I find that, in valuing the subject underwater land and surrounding buffer area, the distinctions recognized by our Supreme Court between valuation of municipally-owned water supply facilities and valuation of privately-owned water supply facilities should be understood and applied generally in accordance with the Tax Court’s analysis in Newark v. West Milford Tp., supra, 7 N.J.Tax 35.
For both municipally-owned and privately-owned water supply land, the first step in the valuation analysis is the selection of a highest and best use. A reservoir has been defined as “[a] natural or artificial place, e.g., a lake, a pond, a tank, where water is collected and stored to supply a community, an irrigation system, or a power plant . . . . .” Appraisal Institute, The Dictionary of Real Estate Appraisal 305 (3d ed. 1993). A reservoir use, therefore, has meaning and can constitute a highest and best use only in the context of an integrated water supply system. In Hackensack Water Co. v. Old Tappan Bor., supra, 77 N.J. at 214, 390 A.2d 122, the Supreme Court found the highest and best use for privately-owned underwater land to be “as a reservoir in conjunction with the operation of a utility water system.” Accordingly, if municipally-owned lands could be valued on the basis of a highest and best use for reservoir purposes, any distinction between the highest and best use analysis for privately-owned water supply facilities and such analysis for publicly-owned water supply facilities would be eliminated. The Supreme Court has, however, established such distinction by holding in Hackensack Water Co. v. Old Tappan Bor. that only privately-owned water supply land may be valued based on a highest and best use as part of an integrated water supply facility, and by holding in Newark v. West Milford Tp., supra, 9 N.J. 295, 88 A.2d 211, that publicly-owned water supply land may not be valued based on such a highest and best use. I conclude, therefore, that, in valuing the subject publicly-owned underwater land and surrounding buffer area, a privately-owned water utility company may not be included within the definition of the “private persons” to which N.J.S.A. 54:4-3.3 *518 refers, highest and best use as a reservoir may not be considered, and value may not be based on such use.
Although the appraiser for the defendant determined that the highest and best use of plaintiffs entire property was as a reservoir, he did not value any portion of the property, including the underwater and buffer areas in Block 400, Lot 1 as a reservoir. He utilized a cost approach to value, with valuation of the land as vacant, based on comparable sales, being the first step in such approach. The appraiser did not value the land using original cost or trended original cost. He determined that the highest and best use for the land as vacant and unimproved was development, as zoned, for residential or office/laboratory development. In so doing, he ignored the presence of over seven billion gallons of water covering 710.2 acres of the land on the theory that the water was an “improvement” to be disregarded both because he was valuing the land “as vacant” and because N.J.S.A. 54:4-3.3 requires valuation “without regard to ... improvements.”
The appraiser’s valuation theory mimics that accepted by the Tax Court in Newark v. Cedar Grove Tp., supra, 7 N.J.Tax 66. Neither such decision nor the record in this matter satisfactorily explains the leap from a highest and best use for reservoir purposes to valuation for development as zoned. The explanation offered by defendant’s appraiser was that, in order to buy the subject lands in Block 400, Lot 1 for reservoir use, plaintiff would pay a purchase price based on the value of such lands as zoned. This analysis mimics the golf course valuation to which the Tax Court refers in Newark v. Cedar Grove Tp., id. at 75, citing Alpine Bor. v. Alpine Hills, Inc., 1 N.J.Tax 136 (1980), aff'd, o.b. 179 N.J.Super. 65, 2 N.J.Tax 391, 430 A.2d 641 (App.Div.1981). In Alpine Hills, the Tax Court held that, in valuing a golf course, there was “no problem in utilizing comparable sales of raw land which were intended to be used for residential purposes. Anyone intending to build a golf course would have to go into the open market and compete with such land buyers, absent zoning restrictions.” 1 N. J.Tax at 142.
*519 The analyses in Newark v. Cedar Grove Tp. and Alpine Hills, conflict with the fundamental appraisal principle that “[b]oth the highest and best use of land as though vacant and property as improved should be the same or similar for each comparable property as for the subject property.” The Appraisal of Real Estate, supra, at 308. In Ford Motor Co. v. Edison Tp., 10 N.J.Tax 153 (1988), aff'd, 12 N.J.Tax 244 (App.Div.) aff'd, 127 N.J. 290, 604 A.2d 580 (1992), the Tax Court described one purpose of a highest and best use analysis as “to assist in ‘identifying comparable properties’ in a direct-sales comparison approach to value.” 10 N.J.Tax at 161.
Highest and best use is a function of the market. “An understanding of market behavior is essential to the concept of highest and best use.” The Appraisal of Real Estate, supra, at 297. In the marketplace, land having a highest and best use which is higher on the scale of uses than a particular buyer’s intended use would not be sold to that buyer. The price warranted by the highest and best use would be unacceptably high to the buyer, and the price warranted by the buyer’s intended use would be unacceptably low to the seller. If the buyer purchased such land for a price based on the land’s highest and best use, the buyer’s use would not sustain or support the price paid. Accordingly, the concept of highest and best use presumes that a buyer seeking land for use as a reservoir or a golf course would not purchase land having a highest and best use for residential development (a highest and best use which is higher on the scale of uses than reservoir or golf course) because the price warranted for residential development would be unacceptably high to the buyer. Similarly, a seller owning land having a highest and best use for residential development would not sell to a buyer whose intended use is as a reservoir or golf course because the price warranted for a reservoir or golf course would be unacceptably low to the seller.
The analysis in Newark v. Cedar Grove Tp. is further flawed by the Tax Court’s equating of reservoir land with golf course land. These two types of land are inherently different, and valuation techniques applicable to one are not automatically applicable to *520 the other. Golf course land is immediately available for development as zoned, while submerged land is not. A golf course is not a permanent condition of property. The underwater condition of the subject land is permanent. Even if, therefore, the appraisal theory in Alpine Hills were correct (which it is not), the theory could not be applied to land submerged under 7,300,000,000 gallons of water. See The Appraisal of Real Estate, supra, at 323 (stating that “[t]he physical characteristics of land ... affect land use and value”).
 Property having a highest and best use as a reservoir simply cannot be valued, as zoned, using comparable sales of developable uplands. The attempt by defendant’s appraiser to do so violates established principles of appraising. I reject the defendant’s valuation analysis for this reason and because: 1) the analysis is contrary to the principle that a municipally-owned water supply property may not be burdened “with a disproportionate share of the tax burden of the taxing district,” Newark v. West Milford Tp., supra, 9 N.J. at 302, 88 A.2d 211; and 2) the analysis wrongly defines water as an “improvement” under N.J.S.A. 54:4-3.3[4] and then, based on such erroneous definition, disregards the principles that “property valuation should have some relationship to reality,” Hackensack Water Co. v. Old Tappan Bor., supra, 77 N.J. at 214, 390 A.2d 122 and “property should be valued in the actual [physical] condition in which the owner holds it.” Id. at 213-14, 390 A.2d 122 (citation omitted).
If Block 400, Lot 1 were owned privately (excluding ownership by a private water utility) and not used for water supply purposes, the underwater and surrounding land would be valued and assessed as underwater land with surrounding buffer. Defendant’s *521 assessment records demonstrate that the lands under all other privately-owned lakes in the Township of Parsippany-Troy Hills have generally been assessed at relatively nominal amounts (based on a fair market value of approximately $1,500 to $3,000 per acre). By valuing plaintiff’s underwater lands as if they were dry, developable uplands, the defendant has failed “to distribute the tax burden of the taxing district equably between the municipality owning watershed lands and the lands of the other taxpayers of the district.” Newark v. West Milford Tp., supra, 9 N.J. at 301, 88 A.2d 211. Under defendant’s valuation approach, the underwater and buffer areas of Block 400, Lot 1 would be subjected to a much higher assessment than would be imposed on similar “lands of private persons,” N.J.S.A. 54:4-3.3, simply because such areas function as a reservoir.
Water is not an “improvement,” and valuing land under water as if the water does not exist, using comparable sales of dry upland, denies reality. Defining water as an improvement appears to be a novel approach developed by defendant and its appraiser for these appeals. The uncontested proofs demonstrated that the assessments on all separately assessed lakes and ponds in the Township of Parsippany-Troy Hills did not include an assessment on the water as an improvement. The appraisal expert for defendant, who is or has been the assessor in over ten municipalities, the appraisal consultant to over forty-five municipalities, and has performed revaluations in many municipalities in ten counties, could identify no instance where the water in a lake, pond, or a reservoir was assessed as an improvement. The expert himself did not value the water as an improvement in two appraisals he prepared on behalf of municipalities defending appeals of property tax assessments on municipally-owned reservoirs. Furthermore, the Supreme Court did not regard water as an “improvement” when valuing underwater land owned by a private utility company at a highest and best use for residential development. In Hackensack Water Co. v. Old Tappan Bor., supra, 77 N.J. at 221, 390 A.2d 122, the Court recognized that the value of the submerged land must be reduced by the cost of removing the water. Water is no more an improvement to municipally-owned *522 underwater land than it was to the privately-owned land in Hackensack Water Co. v. Old Tappan Bor.
Defendant cites Mayor and Aldermen of Jersey City v. Blum, 101 N.J.L. 93, 127 A 214 (E. & A. 1925), an appeal of tax assessments in several municipalities, including the assessment on the reservoir portion of the subject property, as holding that a reservoir is an improvement to land. Based upon my review of the record on appeal to the Court of Errors and Appeals, I disagree with defendant’s interpretation. The Court reversed a judgment of the former Supreme Court which provided:
Ordered that the several assessments for taxes levied by the respective respondents [the tax collector of the Town of Nutley, Township of Caldwell, Township of Little Falls, Township of Cedar Grove, Town of Boonton, City of Clifton, Township of Lyndhurst, Township of Montville and Township of Hanover] upon various conduits and pipes carrying the water from the prosecutor’s reservoir and appurtenances at the Town of Boonton through [the foregoing municipalities], brought up for review, be and the same are hereby set aside, with costs.
[Rule for Judgment entered April 2, 1924 by the New Jersey Supreme Court, Appendix on Behalf of Appellant Township of Hanover at 28, Mayor and Aldermen of Jersey City v. Blum, in 958 Court of Errors and Appeals (1924) (emphasis supplied).]
The record further reveals that the assessment before the Court on the subject property was an assessment of $110,250 on 1,034 acres of land only, imposed by Hanover Township, within whose boundaries the reservoir land was then located. See Robinson, Atlas of Morris County New Jersey, Plate 14 (1887) (showing the geography of the area in which the subject property lies). The Court of Errors and Appeals held that, under what is now codified as N.J.S.A. 54:4-3.3, assessments covering “the reservoir, dam, pipe line, etc.” were improper but, “to the extent that the assessments were levied upon the lands on which the improvements were constructed or through [which] they were laid,” the assessments were proper. Blum, supra, 101 N.J.L. at 98, 127 A. 214. The reference to the “reservoir” was clearly unnecessary based on the facts before the Court and appears after the Court noted that the statute authorized taxes levied on land “exclusive of the value added thereto by the improvements constructed thereon.” Ibid. I conclude that the term “reservoir” as used in Blum does not refer to water.
*523 The term “reservoir” can refer to an “improvement” when used to describe the basin in which the water is located. Such basin can be constructed of concrete, steel, or other materials. See Emerson Bor. v. State Bd. of Taxes and Assessment, 6 N.J.Misc. 326, 327, 141 A. 23 (Sup.Ct.1928) (affirming the determination of the State Board that “only buildings and other structures on the [reservoir] lands are included as improvements, ... ”). Cf. N.J.A.C. 18:22, App. 1 (setting forth tax rates applicable to different types of privately-owned water supply facilities including the following categories: “Ground or Underground Reservoirs— Steel Tanks” and “Ground or Underground Reservoirs — Concrete — Open”). The reservoir “improvement” to which defendant’s appraiser refers is not the basin but the water in the basin. His definition finds no support in the Blum decision.
Defendant also cites Clifton v. North Jersey District Water Supply Comm’n., 104 N.J.Super. 147, 249 A.2d 14 (App.Div.1969), where a 15,000,000 gallon above-ground tank was excluded from assessment under N.J.S.A. 54:4-3.3 as an “improvement.” Defendant argues that plaintiff placed only the water and not the tank on Block 400, Lot 1 and that the water is as much an improvement as the tank. I reject this argument. If plaintiff had constructed an underground steel tank or steel-lined basin which contained the reservoir water, the tank or basin would be a non-assessable improvement. Under neither the Clifton facts nor the hypothetical facts can the water in the tank, or in the basin, be itself regarded as an improvement.
R.C. Maxwell Co. v. Galloway Tp., 145 N.J. 547, 679 A.2d 141 (1996), does not require a different interpretation of the term “improvements” as used in N.J.S.A. 54:4-3.3. Firstly, the Supreme Court in Maxwell was not addressing the use of such term in this statute, but was defining “improvement” as used in N.J.S.A. 54:4-1 for purposes of distinguishing an “improvement” from “personal property affixed to real property.” Secondly, the Court defined an “improvement” as “an addition to land that is obviously, unmistakably, and inherently permanent” and cited, in support of its definition, Treas. Reg. § 1.48(c) (1964) which defines *524 improvements as “inherently permanent structures.” R.C. Maxwell, supra, 145 N.J. at 555, 679 A.2d 141. The water in the subject reservoir is not an “addition” to the land, and it is not a “structure.”
Black’s Law Dictionary (5th ed. 1979) defines an improvement as:
A valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes. Generally, buildings, but may also include any permanent structure or other development, such as a street, sidewalks, sewers, utilities, etc.
[Id. at 682.]
The water in the subject reservoir is not a “valuable addition” to the land, nor does the water “improve” the land. Indeed, defendant seeks to ignore the presence of the water precisely because the water significantly diminishes the value of the underlying land, even though, in the words of The Boonton Times in 1902, the “lake” may have enhanced “the beauty of picturesque Boonton.” “Jersey City Water Works,” supra.
The parties agree that the water is permanent, and that such permanency results from environmental laws and regulations existing and foreseeable as of the applicable valuation dates. In analogous situations where governmental restrictions have affected the condition of property or inhibited its potential for development, the Tax Court and other New Jersey courts have recognized the impact on value resulting from such restrictions. See Bergen Cty: Assocs. v. East Rutherford Bor., 12 N.J.Tax 399, 413 (1992), aff'd, 265 N.J.Super. 1, 625 A.2d 524, certif. denied, 134 N.J. 482, 634 A.2d 528 (1993) (noting that “governmental restrictions may affect the value of real property for property tax purposes” and cataloging types of regulations, such as pinelands development controls, sewage disposal requirements and zoning regulations, which have been held to affect value); see also Inmar Assocs., Inc. v. Carlstadt Bor., 112 N.J. 593, 600, 549 A.2d 38 (1988) (noting that environmental clean-up regulations “will undoubtedly affect the true value of real property”). See also N.J.S.A 13:9B-19 which requires that denial of a freshwater wetlands permit under the *525 Freshwater Wetlands Protection Act, N.J.S.A. 13:9B-1 to -30, shall “be taken into account when the property is valued, assessed, and taxed for property tax purposes.” Cf. East Cape May Assocs. v. Department of Envtl. Protection, 300 N.J.Super. 325, 693 A.2d 114 (App.Div.1997) (holding that “[g]overnmental regulation which prohibits ‘all economically beneficial or productive use of land’ is a ‘taking’ for which just compensation is constitutionally required.” Id. at 336, 693 A.2d 114 (citations omitted)).
Based on the foregoing analysis, I conclude that the requirement in N.J.SA. 54:4-3.3 that property shall be taxed “without regard to buildings and other improvements” does not refer to water and does not require or permit the total disregard of the water on the subject property. I will, therefore, determine the value of the underwater land and surrounding buffer area in Block 400, Lot 1 in the physical condition in which the owner holds it, In re Appeal of East Orange, supra, 80 N.J.Super. at 230, 193 A.2d 377, that is, under water with a surrounding buffer. Because N.J.S.A. 54:4-3.3 requires the property to be taxed “in the same manner and to the same extent as the lands of private persons,” and because I have previously concluded that this language does not contemplate ownership by a private water utility for reservoir use, I will value such underwater land and surrounding buffer area as it would be valued if owned by the “private persons” contemplated by the statute, that is, as a lake with a highest and best use, as determined by plaintiffs appraiser, for conservation and open space.
Defendant argues, based on the following statement in The Appraisal of Real Estate, that conservation and open space cannot be a highest and best use:
The Appraisal Institute position can be summarized as follows: 1) if the purpose of an appraisal assignment is to estimate market value, then the highest and best use of the property to be appraised must be an economic use; and 2) preservation and conservation are not recognized as an alternative to be considered in highest and best use analysis.
[The Appraisal of Real Estate, supra, at 27.]
This “position” appears in the context of a discussion of “public interest value” in which the focus is whether “comparables from *526 other public-transactions” should be used as the basis for determining the price to be paid for land acquisitions by agencies of the federal government. The concern is that the use of such sales results in higher value than would be demonstrated if sales having an economic highest and best use were used.
The applicability of the quoted language is limited by its context. In the subject appeals the issue is not public interest value. Under N.J.S.A. 54:4-23, value must be based on the price the property “would sell for at a fair and bona fide sale by private contract,” and, under N.J.S.A. 54:4-3.3, the subject lands are subject to taxation “in the same manner and to the same extent as the lands of private persons.”
Furthermore, in valuing the subject wetlands, wetlands transition areas, buffer area, and underwater land for property tax assessment purposes, the impact on value of governmental regulations must be considered. Such regulations effectively preclude development of these portions of the property. As a result, valuation based on an “economic” highest and best use would be totally unrealistic. An economic highest and best use analysis might be appropriate if the water could be removed (which, in reality, it cannot) and the wetlands filled (which, in reality, they cannot). Even then, such analysis might be fruitless if the cost of draining the water and filling and reclaiming the land deprived “economic” uses of financial feasibility. This cost is likely to be substantial and, perhaps, prohibitive. See Hackensack Water Co. v. Old Tappan Bor., supra, 77 N.J. at 213, 390 A.2d 122 (refusing to permit valuation of reservoir land for residential development where the cost of draining and filling the reservoir “would far exceed the fair market value of residential property in the area”).
Valuing the wetlands, wetlands transition areas, buffer area, and underwater land at the subject property at a highest and best use as a reservoir is, as discussed above, precluded by the Supreme Court. Development of such portions of the property is precluded by the presence of the body of water and by applicable governmental regulations. The property, therefore, cannot be put to an “economic” use, and valuing the property based on a highest *527 and best use for conservation and open space is both reasonable and necessary. See East Orange v. Livingston Tp., 15 N.J.Tax 36, 47 (1995) (finding a highest and best use for “open space/conservation” where an indefinite ban on sewer hookups “precludes [the] use of any part of the subject property for residential purposes notwithstanding the fact that the property is zoned residential”).
Having decided upon the valuation methodology to be applied to the underwater land and buffer area in Block 400, Lot 1, I now proceed to determine the value of the entire lot. In doing so I am mindful of comments by the Supreme Court in Newark v. West Milford Tp., supra, 9 N.J. 295, 88 A.2d 211, and in Ford Motor Co. v. Edison, Tp., supra, 127 N.J. 290, 604 A.2d 580. In the former decision the Court stated:
The lands here in question cannot be sold by private contract, and because of the vast acreage involved there are few if any comparable holdings in the hands of private persons. So it follows that the assessment of these lands cannot be fixed with any degree of mathematical exactness but must be fixed by a reasonable and equable comparison with the true value of smaller comparable holdings of private persons. A reasonably approximate and comparable true value based upon the same principles of taxation applicable to these holdings of private persons will be a compliance with the statutory direction.
[Newark v. West Milford Tp., supra, 9 N.J. at 303, 88 A.2d 211.]
Although the subject lot is approximately one-eighteenth the size of the acreage at issue in Newark v. West Milford Tp., the Lot contains 1,116.14 acres of which underwater land, buffer area, wetlands, and wetlands transition areas constitute an aggregate of 1,017.012 acres. Because of this substantial size, and because 710.2 acres are underwater, I conclude that the valuation proofs must be considered in light of the quoted standard.
In Ford Motor Co. v. Edison Tp., the Supreme Court articulated the Tax Court’s responsibility to find value as follows:
When an original assessment is unreliable, the Tax Court may not invoke its presumptive correctness and must establish value, even if it means coming to a determination contrary to both experts.
[Id. at 313, 604 A.2d 580 (citation omitted).]
I am convinced that the assessments on Block 400, Lot 1 are “unreliable.” In reaching this conclusion I am influenced by the *528 following factors: (a) plaintiffs valuation evidence; (b) defendant’s adoption of a wholly unrealistic valuation approach in order to defend such assessments; (c) that defendant’s valuation approach is, as to the underwater acreage, contrary to the valuation methodology used by defendant’s appraisal expert in other contexts, including other property tax assessment appeals involving underwater lands in municipally-owned water supply facilities; (d) defendant’s assessment practices with respect to other underwater land; and (e) the nearly 30% reduction in the 1996 assessment on the subject lot which reduction the assessor testified was based upon specific information from the township engineers as to which lands were “reservoir land” and which were uplands.
I will, therefore, proceed to “establish value,” even though, as discussed below, I find some portions of the valuation proofs to be only marginally adequate. In making my value determinations, I am cognizant of the following guidelines articulated by the Appellate Division: 1) “the trial judge as the fact finder is not bound by the opinion valuation of the experts on either side. Just as a jury, a judge may adopt ‘so much of it as appears sound, reject all of it, or adopt all of it.’ ” Middlesex Cty. v. Clearwater Village, Inc., 163 N.J.Super. 166, 174, 394 A.2d 390 (App.Div.1978) (citation omitted), certif. denied, 79 N.J. 483, 401 A.2d 239 (1979); and 2) “[t]he right of [a] plaintiff to a fair valuation is not to be lost because of a difficulty in quantifying it.” City of Newark v. Jefferson Tp., 13 N.J.Tax 217, 222 (App.Div.1992), certif. denied, 133 N.J. 430, 627 A.2d 1137 (1993).
The first issue in making a value determination as to Block 400, Lot 1 is the appropriate width of the buffer area surrounding the 710.2 underwater acres. The width of the buffer was not, as of the valuation dates, prescribed by statute or regulation. Maps prepared by defendant’s engineers showed a 250 foot wide buffer surrounding the underwater portion of the lot, but defendant presented no testimony or other evidence as to the basis for this width. Plaintiff presented extensive testimony by its expert witnesses that the marketplace would assume a 300 foot wide buffer area. This testimony was based on an analysis of: (i) the Water *529 shed Protection Act, L. 1988, c. 163, as amended by L. 1990, c. 19; (ii) the Freshwater Wetlands Protection Act, N.J.S.A. 13:9B-1 to - 30, and regulations promulgated pursuant thereto, N.J.A.C. 7:7A-1.1 to 14.6; (iii) recommendations by the New Jersey Department of Environmental Protection; (iv) legislation pending in the State Legislature; (v) the designation of Block 400, Lot 1 by the New Jersey Office of State Planning as an environmentally sensitive area; and (vi) a study by Cook College on Watershed Management Strategies. I accept this undisputed testimony and, for purposes of valuing Block 400, Lot 1, will assume a 300 foot wide buffer area surrounding the water. Plaintiffs expert calculated the area of this buffer, together with slivers of land rendered landlocked by the buffer, as 279.72 acres. I accept this calculation and the expert’s calculation that a 300 foot wide buffer leaves 33.1 acres of wetlands and wetlands transition areas on the lot, and 93.128 acres of developable uplands in the R-3 Zone.
Plaintiffs experts determined that the portions of Block 400, Lot 1 located in the R-l Zone and the SED-3 Zone were not developable because of the impact of the 300 foot wide buffer. Defendant’s engineer determined that 24 of the 26 acres in the R-1 Zone and all of the acres in the SED-3 Zone were developable upland. This determination is of little assistance because it is based on an assumption which I have rejected, namely, that the water on the lot can be disregarded. Based on drawings prepared by the engineers for defendant, I find that the buffer area affects sufficient portions of the R-l and SED-3 Zone land to preclude development of such land.
In valuing the 93.128 acres of developable uplands, plaintiffs appraiser considered provisions from the zoning ordinance permitting use of the property for single family residential development on lots having a minimum size of 15,000 square feet and, as a conditional use, for townhouse development at a density of 2.5 units per acre. He determined a highest and best use of “future residential development” (the limitation to “future” development being related to the “moratorium discount” discussed below), and then valued the property based on comparable sales of land for *530 single family residence development. Defendant’s appraiser considered the same provisions of the zoning ordinance, determined a highest and best use of “residential townhouse use,” and valued the land based on comparable sales of land for townhouse or condominium development. I find the highest and best use analysis by defendant’s appraiser to be more thorough than the analysis by plaintiffs appraiser, and conclude that the highest and best use of the developable uplands is for residential townhouse use. As a result, the only evidence relevant to a valuation of the uplands is that provided by defendant’s appraiser. Values indicated by land sales for single family residential development cannot be utilized as value indicators for townhouse development. The Appraisal of Real Estate, supra, at 303; Ford Motor Co. v. Edison Tp., supra, 10 N.J. Tax at 161.
Defendant’s appraiser considered seventeen comparable land sales which he adjusted for time (market conditions), approvals and location, and determined a land value of $25,000 per townhouse unit. Because of the size of the project contemplated by his appraisal, 2,342 townhouse units on 937 acres, the appraiser discounted his per unit value to $12,500. The parties stipulated to this value of $12,500 per unit for 2,342 units but agreed that such stipulation would not be applicable to a development on fewer than 937 acres. Accordingly, for the 93.128 acres which I have determined to be developable upland, I must make a finding as to value.
I find the adjustments by defendant’s appraiser for approvals and location to be reasonable, and I accept them. The approvals adjustment was a uniform negative percentage applied to each sale in which the property had development approvals, because the subject property had no such approvals. The location adjustments were derived from an analysis of the median values of single family homes in the municipalities in which the sale properties were located.
Defendant’s appraiser made adjustments for time based on his “Ratio Study Analysis,” a study of the ratios promulgated pursuant to N.J.S.A. 54:l-35(a). This study revealed a 20% appreciation in property values in each of the years 1988 and 1989, a 3% *531 appreciation during each of the years 1990 and 1991, and no appreciation or depreciation dining the years 1992,1993, and 1994. Plaintiffs appraiser, in adjusting his comparable sales for time, studied average residential sales prices from July 1985 to June 1995 in five municipalities, including Parsippany-Troy Hills and the municipalities where a majority of the comparable sales used by defendant’s appraiser were located. He also studied the number of building permits issued in Parsippany-Troy Hills during each of the years 1978 through 1995. Based on these studies, plaintiffs appraiser determined that residential land values neither appreciated nor depreciated in 1987, depreciated by 3% in 1988 and depreciated by 12% in 1989. He provided no specific information as to annual changes in market conditions after 1989. He obviously concluded, however, that the market was stable between October 1, 1990 and October 1, 1995 because neither his appraisal report nor his testimony indicated any change in the value of the subject property during such time period.
I find the time adjustments for the years 1987 through 1989 by plaintiffs appraiser are more reliable than those of defendant’s appraiser. Plaintiffs appraiser based his adjustments on a study of market conditions relating only to residential properties. Defendant’s appraiser based his adjustments on a study of ratios which were influenced not only by market trends in residential properties but also by trends in commercial and industrial properties and by prior years’ market conditions. See State of New Jersey, Division of Taxation Handbook for N.J. Assessors § 1002.4 to -.44 (1989) (describing the ratio calculation procedures). In addition, the adjustments by defendant’s appraiser are contrary to the value trend indicated by two sales considered by the appraiser involving the same property. Such property sold in January 1988 at a price of $29,173 per unit and resold in October 1992 at a price of $20,408 per unit, reflecting a 30% decline in the per unit price. Based on the analysis of market conditions by defendant’s appraiser, the price should have increased by 46%. This one set of paired sales does not conclusively refute the appraiser’s analysis, but the sales do cast doubt on his conclusions. Because plaintiffs appraiser provided no annual market conditions *532 analysis applicable to any year after 1989 (although his appraisal indicated market stability commencing in 1990), I will accept the determination of defendant’s appraiser that there was appreciation of 3% in each of the years 1990 and 1991 and no appreciation or depreciation in 1992, 1993, or 1994. In summary, in analyzing the comparable townhouse/condominium land sales used by defendant’s appraiser, I will, based on the foregoing discussion, apply the following time adjustments:
1987 - 0%
1988 - - 3%
1989 - -12%
1990 - + 3%
1991 - + 3%
1992 - 0%
1993 - 0%
1994 - 0%
Of the seventeen comparable land sales considered by defendant’s appraiser, eight occurred during the years 1991 through 1994. As adjusted by the appraiser (whose adjustments I accept), these sales reflected per townhouse unit prices as of October 1, 1990 ranging from $9,200 to $15,400. The remaining nine sales occurred between 1987 and 1988. After substituting my time adjustments for those of defendant’s appraiser, but applying his adjustments for approvals and location, I find that these nine sales reflected per townhouse unit prices as of October 1, 1990 ranging from $9,100 to $26,300.
The mean per townhouse unit price indicated by all seventeen sales is $16,400. The mean per unit price indicated by the 1991 through 1994 sales, a period of market stability, is $12,500. I find that the fair market value of the subject 93.128 acres of developable uplands should be based on a per townhouse unit price of $15,000. There is nothing in the record to indicate that the density of a townhouse development on this tract would exceed the 2.5 units per acre specified by the zoning ordinance. Such density produces a total of 233 units. There is also nothing in the record to support a “size discount” for this number of units, and I will apply no such discount. I conclude, therefore, that the October 1, *533 1990 value for the 93.128 acres of developable uplands was $3,495,-000 ($15,000 x 233). I will increase this value by 3% to $3,599,900 as of October 1, 1991 and as of each valuation date thereafter.
There remains for consideration the value of the 33.1 acres of wetlands and wetlands transition area, the 279.92 acres of buffer area, and the 710.2 acres of underwater land. Defendant’s appraiser valued all of these areas as developable uplands. I have rejected his approach. As a result, only plaintiffs witnesses provided relevant valuation evidence as to these portions of Block 400, Lot 1.
Plaintiffs appraiser used only a comparable sales approach in valuing the underwater land, buffer area, wetlands, and wetlands transition areas in Block 400, Lot 1. He considered seventeen sales, only nine of which he inspected. Three sales involved all underwater land and three involved land 93% to 97% under water. Eight sales involved wetlands and the three remaining sales were of uplands adjacent to reservoirs. The appraiser made no adjustments to these sales for time (market conditions), location, physical characteristics, or zoning. Such adjustments would normally be necessary, The Appraisal of Real Estate, supra, at 403-04, but the appraiser concluded that adjustments were unnecessary because the sales prices of the comparables were not affected by zoning, location, or particular physical characteristics, nor did the sales prices change over time. Based on this overall view of the seventeen comparable sales, the appraiser determined a value of $2,500 per acre for the underwater land, buffer area, wetlands, and wetlands transition areas. As a check on this value, the appraiser considered four sales of large tracts of land ranging from approximately 400 to approximately 1,200 acres each. These sale properties contained varying percentages of wetlands, steep slopes, and developable uplands. After adjustments, the sales reflected a land value for the entirety of Block 400, Lot 1 of $3,500 per acre. I attribute very little weight to such sales, in part because plaintiffs appraiser used them only as a “check” on value, and mainly because the physical characteristics of the sale properties vary significantly from the subject property.
*534 In describing the details of his analysis which led to the overall value conclusion of $2,500 per acre, plaintiffs appraiser explained that he developed a separate value for the wetlands and wetlands transition areas, another value for the buffer area, and a third value for the underwater land. Two thousand-five-hundred dollars per acre represents approximately a weighted average of these three values.
The appraiser first valued the 33.1 acres of wetlands and wetlands transition area. He used two comparable sales. One sale, which reflected a per acre value of $3,125, took place on June 29, 1988 and the other sale, which reflected a value of $2,198 per acre, took place on June 8, 1989. From these sales, the appraiser determined the value of the wetlands and wetlands transition areas to be $2,500 per acre. I accept these sales as sufficient to support the appraiser’s value opinion for these 33.1 acres, but I find that a time (market conditions) adjustment is appropriate. The appraiser for plaintiff and the appraiser for defendant made such an adjustment to the comparable sales each used to value the developable upland portions of the subject property. I find no basis in the record for distinguishing wetlands from other types of property with respect to this adjustment, or for adjusting these wetlands sales other than by using the same time adjustments I applied above in analyzing townhouse/condominium land sales. The sale on June 29,1988 should, therefore, be adjusted by - 11% to reflect a value of $2,781 per acre, and the sale which occurred June 8, 1989 should be adjusted by - 4% to reflect a value of $2,110 per acre. Based on these two sales, I find the value for the wetlands and wetlands transition areas of Block 400, Lot 1 to be $2,300 per acre (46.97% of the aggregate adjusted sales prices; $2,500 per acre represents the same percentage of the unadjusted sales prices) or $76,100 as of October 1,1990. I will increase this value by 3% to $2,400 per acre or $79,400 as of October 1, 1991 and as of each valuation date thereafter.
Plaintiff’s appraiser determined that the value of the buffer area was $7,000 per acre as of October 1, 1990. Such value was based on a sale which took place in November 1995 reflecting a per acre *535 value of $5,878 and the appraiser’s opinion as to the appropriate relationship between the value of wetlands and the value of the buffer area. I accept such value subject, however, to an appropriate time adjustment. A negative 3% adjustment is required for the October 1, 1990 valuation date, and no adjustment is required for the valuation dates thereafter. I will, therefore, apply a value of $6,790 per acre ($7,000 less 3%) for the 279.92 acres of buffer area as of October 1, 1990 and $7,000 per acre thereafter. The total value is $1,900,700 as of October 1,1990, and $1,959,400 as of October 1,1991 and each valuation date thereafter.
Plaintiffs appraiser valued the 710.2 acres of underwater land at $750 per acre or 30% of his per acre value for wetlands. He relied on three comparable sales, only one of which he inspected. That one sale reflected a sales price of $.02 per acre, and I reject the sale as not indicative of market value. The remaining two sales (and the rejected sale) served not as indicators of value but only as support for the appraiser’s opinion that underwater land had a value substantially below wetlands. The premise is reasonable, but the appraiser provided no comparable sales or other support for his selection of $750 per acre or a 30% ratio. Compare Hackensack Water Co. v. Woodcliff Lake Bor., 9 N.J.Tax 545, 551 (1988), where the defendant’s expert supported a valuation of underwater land at 25% of the value of residentially zoned land “with a sophisticated comparison of sales of underwater land in Jefferson and Roxbury Townships with sales of upland property in those communities.” This absence of factual support undermines the probative utility of the appraiser’s allocated value for the underwater lands. “The probative utility of an expert’s opinion rests entirely on the facts , and reasoning offered in support of it.” Willow/Leonia Assocs. v. Leonia Bor., 12 N.J.Tax 338, 344 (1992) (citations omitted).
The failure by plaintiffs appraiser to provide factual support for his value determination as to the underwater land could support a finding that plaintiff failed to overcome the presumption of correctness which attached to the assessment on Block 400, Lot 1. Pantasote Co. v. City of Passaic, 100 N.J. 408, 417, 495 A.2d 1308 *536 (1985). I decline to make such finding because of the admonition from the Supreme Court in Ford Motor Co. v. Edison Tp., supra, 127 N.J. at 313, 604 A.2d 580, and my conclusion that the assessment on this lot is unreliable. I will proceed to establish value for the underwater land using the reliable evidence before me. That evidence established the value of wetlands at $2,300 per acre' as of October 1,1990 and $2,400 per acre as of each valuation date thereafter. Having no evidence, other than the unsupported opinion of plaintiffs appraiser, as to the value of underwater land or as to what percentage of wetlands value should be attributed to underwater land, I will value the underwater land at the same amount per acre as wetlands. Accordingly, I find the value of the 710.2 acres of underwater land to be $2,300 per acre or $1,633,500 as of October 1, 1990, and $2,400 per acre or $1,704,500 as of October 1,1991 and as of each valuation date thereafter.
My value for Block 400, Lot 1, based on the foregoing findings, is $7,105,300 as of October 1,1990 and $7,343,200 as of October 1, 1991 and as of each valuation date thereafter, subject to the “moratorium discount” discussion below with respect to the developable portion of the lot.
There are three additional lots under appeal, namely, Block 494, Lot 8, and Lots 1 and 2 in Block 450. Block 494, Lot 8 contains 49.53 acres, all located in the R-l Zone. Plaintiffs appraiser determined a value for this lot of $1,200,000 before applying a moratorium discount, and $600,000 after applying the discount. Defendant’s appraiser determined a value of $1,722,000 as of October 1, 1990 and $1,773,700 for each valuation date thereafter. Plaintiffs appraiser testified that only 31.53 acres of such lot were developable because approximately one-third of the site had slopes over 30% and wetlands. A Parsippany-Troy Hills ordinance prohibited soil disturbance where slopes exceed 25%. The appraiser’s conclusions as to these areas were based upon a thorough personal inspection of the lot. Defendant’s appraiser testified that the entire 49.53 acres were developable. He made no detailed inspection of this lot nor did defendant’s engineer. The engineer testified that he drove around the subject property, but *537 did not walk the property for purposes of determining which areas were developable. His conclusions as to developable areas were based solely on his examination of topographic maps available to him. These topographic maps showed significant slopes located in the northern portion of this lot. They did not show wetlands, but the engineer testified that he made no effort to determine if hydric soils, characteristic of wetlands, were located on the lot. Accordingly, I accept the testimony of plaintiffs experts and find that 31.53 acres of this lot were developable. Such acres were located in the R-l Zone. The parties stipulated that R-l Zone land had a value, as of October 1,1990, of $33,760 per acre. Accordingly, this portion of the lot had a value of $1,064,500 as of October 1, 1990. I will increase this value by 3% to $1,096,400 as of October 1,1991, and as of each year thereafter. Such values are subject to the moratorium discount discussion below.
Plaintiffs appraiser determined an overall per acre value for this lot, and, therefore, provided no evidence as to the value of the eighteen non-developable acres, or any evidence as to the number of wetlands acres included in the total. In the absence of such evidence, I will value these eighteen acres at $6,790 per acre as of October 1, 1990 and at $7,000 per acre as of October 1, 1991 and each valuation date thereafter. These are the highest per acre values I have used for non-developable land. This results in a value of $122,200 as of October 1, 1990. As of October 1, 1991, and as of each valuation date thereafter, the value increases by 3% to $126,000.
My total value for Block 494, Lot 8 is $1,186,700 as of October 1, 1990 and $1,222,400 as of October 1,1991 and each valuation date thereafter.
The remaining land comprises Lots 1 and 2 in Block 450. Plaintiffs appraiser provided no separate valuation for each of such lots, but determined a combined value of $36,000. Defendant’s appraiser valued Lot 1 at $854,000 as of October 1,1990 and $879,600 as of each valuation date thereafter. He valued Lot 2 at $624,000 as of October 1,1990 and at $642,700 as of each valuation date thereafter. In determining such values, defendant’s apprais *538 er disregarded the body of water on Block 400, Lot 1 and the concomitant surrounding buffer and assumed both lots were fully developable. For the reasons discussed above, I reject this valuation methodology. Furthermore, defendant’s appraiser and engineer made the same type of inspection of these lots as they made of Block 494, Lot 8 and, therefore, their opinions as to utility of the land merit only limited weight.
I find that the 300 foot wide buffer area surrounding the body of water on Block 400, Lot 1 will impinge on both lots in Block 450. I further find, based on the testimony by plaintiffs expert, who made a thorough inspection of these lots, that Lot 1 is landlocked with access to a public road only through Lot 2 and that Lot 2 has approximately half of its acreage affected by steep slopes and wetlands. There is an obvious difference in the value per acre of each of these lots. The same factors which resulted in my finding that the assessment on Block 400, Lot 1 was unreliable are also applicable to the assessments on these lots. Plaintiffs appraiser, however, provided no basis for me to determine a per lot value. I will, therefore, affirm the assessments for each year under appeal, specifically $45,000 on Lot 1 and $170,600 on Lot 2.
The issue remaining is that of the “moratorium discount” which plaintiff contends should be applied in valuing the 93.128 acres of developable uplands in Block 400, Lot 1 and the 31.53 acres of developable uplands in Block 494, Lot 8. The basis for such contention is the Watershed Protection Act, L.1988, c. 163, enacted and effective on November 16, 1988, which provided in Section 1 thereof: “For a period of 18 months commencing on the effective date of this act, no municipality, municipal utilities authority, or public utility shall convey any land utilized for the purpose of the protection of a public water supply on the effective date of this act.” L.1990, c. 19, enacted and effective May 7, 1990, extended the moratorium, just as the eighteen month time period was about to expire, as follows:
No municipality, municipal utilities authority, or public utility shall convey any land utilized for the purpose of the protection of a public water supply prior to the adoption by the Department of Environmental Protection of the rules and regulations establishing buffer zones for all watershed lands associated with public water *539 supply reservoirs for the purpose of protecting drinking water quality required pursuant to the “Watershed Protection Act,” P.L. —, c. — . . . .(now before the Legislature as Senate Bill No. 2339 of 1990).
In Newark v. Hardyston Tp., supra, 285 N.J.Super. 385, 667 A.2d 193, the defendant Township of Hardyston asserted that the moratorium should not be considered in valuing the City of Newark’s property for tax assessment purposes because the moratorium automatically expired at the expiration of the eighteen month period incorporated in the initial legislation. The Appellate Division determined that the primary legislative objective in enacting the Watershed Protection Act was protection of the watershed, and the secondary objective was the creation of a comprehensive statewide policy relating to population density, levels of growth, and development and similar land use considerations in implementing a “multi-zone buffer approach to statewide watershed management.” Id. at 396, 667 A.2d 193. The court concluded that an interpretation of the Watershed Protection Act which found that the moratorium expired “would fly in the face of common sense, omit consideration of the breadth and importance of the legislative objectives, and render the 1990 amendment futile.” Ibid.
Plaintiff asserts that the value of the developable uplands should be discounted because, as of the relevant valuation dates, all of such upland constituted land required for the purpose of protection of a public water supply and was subject to the moratorium on conveyances because no buffer zones had been established. Plaintiff also asserts that such value should be discounted because of the unavailability of sewers which would be required for development. The discount would be the same if the moratorium were in effect but sewers were available, or if the moratorium were not in effect but sewers were unavailable. Plaintiffs appraiser applied a 15% discount rate for five years. He selected this discount rate after studying discount rates ranging generally from 10% to 15% for other types of property, including shopping centers, suburban office buildings and apartments. These rates, which reflect the minimum rate of return an investor would require, are applied as a discount on the theory that an investor anticipating a delay in *540 receipt of the minimum return would pay a lower purchase price. The appraiser selected a five year discount period based on his view of how the market would estimate the time period required for regulations to be adopted establishing buffer zones, and for sewers to become available. Sewer availability, in the appraiser’s opinion, required approval by the New Jersey Department of Environmental Protection of an amendment of the Wastewater Management Plan applicable to the property. See generally N.J.S.A. 58.11A-1 to -16 (Water Quality Planning) and N.J.A.C. 7:15-5.1 to -5.23 (Wastewater Management Planning Requirements).
Defendant contends that no moratorium discount should be applied to the developable uplands in the subject property because the highest and best use for the entire property, including the uplands, is as a reservoir and all of the uplands are required to support the reservoir use. Defendant cites Hackensack Water Co. v. Haworth Bor., 178 N.J.Super. 251, 2 N.J.Tax 303, 428 A.2d 934 (App.Div.), certif. denied, 87 N.J. 378, 434 A.2d 1063 (1981), in support of this contention, noting that, in the context of an appeal of the property tax assessment on a privately-owned water supply facility, the Appellate Division found inadequate factual support in the record for the conclusion by the Tax Court that the Board of Public Utilities would permit a sale of uplands for residential development and would not require such lands to remain undeveloped for water utility purposes. Defendant’s argument is consistent with its approach to valuing the subject property. That approach, as discussed in detail above, finds a highest and best use as a reservoir, and then, based at least in part on such finding, ignores the presence of the 7,300,000,000 gallon body of water on the property and values the entire property as upland suitable for development in accordance with the applicable zoning ordinances. In one fell swoop, therefore, defendant has argued that a moratorium discount is inappropriate because the property is required for preservation of the reservoir, and simultaneously valued the property as if the reservoir did not exist. I reject defendant’s contentions on this issue.
*541 I find, based on the testimony of the compliance Officer at the Parsippany Sewer Utility, that, as of the applicable valuation dates, sewer service was available at property adjacent to the developable uplands portions of the subject property, and that no amendment to the Wastewater Management Plan would have been required to extend sewer lines and service into such uplands portions. Accordingly, I conclude that no discount should be applied based on a delay in development resulting from sewer unavailability.
I also conclude that no discount should be applied based on the Watershed Protection Act. The Act imposes a moratorium on conveyances of land required to protect a public water supply. I have previously found that the subject property may not be valued at a highest and best use as a water supply reservoir, and I have determined that the appropriate highest and best use for the non-developable portions of the property, including the body of water, is for conservation and open space. There is an obvious inconsistency between valuing property as if it were not a public water supply facility and then applying a moratorium discount to a portion of the property because conveyance of such portion is prohibited by a statute applicable only to property required for the protection of a public water supply. This inconsistency alone precludes application of a moratorium discount.
Furthermore, I have accepted plaintiffs position that a three hundred foot wide buffer area, surrounding the body of water on Block 400, Lot 1, should be utilized for valuation purposes, leaving 93.125 acres of developable uplands in that Lot and 31.53 acres of developable uplands in Block 494, Lot 8. Plaintiffs experts determined the buffer width and uplands areas based on materials relating to protection of public water supplies as well as protection of general water quality. The record contains nothing which would demonstrate that, if the subject property were treated as a water supply facility, a buffer exceeding three hundred feet in width would be required or would be anticipated in the marketplace. The moratorium on conveyances imposed by the Watershed Protection Act terminates when buffer areas are established *542 by the New Jersey Department of Environmental Protection. Here, plaintiffs experts have determined what those buffer areas are likely to be and what the market would anticipate them to be. For purposes of these appeals, therefore, the uncertainty created by the Watershed Protection Act has been removed, and there is no reason to apply a discount based on an estimate of the content and timing of future regulatory action by the Department of Environmental Protection.
The following is a summary of my valuation findings.
Block/Lot Tax Year 1991 Each of Tax Years 1992-1996
400/1
Uplands $8,495,000 $3,599,900
Wetlands 76,100 79,400
Buffer Area 1,900,700 1,959,400
Underwater Land 1,633,500 1,704,500
Total $7,105,300 $7,343,200.
494/8
Uplands $1,064,500 $1,096,400
Slopes and Wetlands 122,200 126,000
Total $1,186,700 $1,222,400.
The assessment on Block 400, Lot 1 was $11,162,300 for each of the years 1991 through 1995 and $7,826,000 for 1996. The assessment on Block 494, Lot 8 was $1,114,400 for each of the years 1991 through 1995 and $488,400 for 1996. The upper limits of the common level range under Chapter 123, N.J.S.A. 54:1-35a(b), were as follows:
1991 60.24%
1992 62.79%
1993 62.72%
1994 64.86%
1995 65.81%
1996 66.52%.
*543 The ratio of assessment to fair market value for Block 400, Lot 1 exceeded 100% for each year under appeal. Accordingly, under N.J.S.A. 54:51A-6, the assessments on this lot must be determined by multiplying the fair market value for each year by the applieaThese calculations are as follows: ble 123 ratio.
Year Value Ratio Proper Assessment (Land Only)
1991 $7,105,300 52.38% $3,721,800
1992 $7,343,200 54.60% $4,009,400
1993 $7,343,200 54.54% $4,005,000
1994 $7,343,200 56.40% $4,141,600
1995 $7,343,200 57.23% $4,202,500
1996 $7,343,200 57.84% $4,247,300.
For Block 494, Lot 8, the ratio of assessed value to fair market value for each of the years 1991 through 1995 also exceeded 100%. For 1996, such ratio was 39.81%, below the lower limit of the common level range (43.47%). For all years, therefore, the proper assessment must be determined by multiplying the fair market value for each year by the applicable Chapter 123 ratio. These calculations are as follows:
Year Value Ratio Proper Assessment (Land Only)
1991 $1,186,700 52.38% $621,600
1992 $1,226,200 54.60% $669,500
1993 $1,226,200 54.54% $668,800
1994 $1,226,200 56.40% $691,600
1995 $1,226,200 57.23% $701,800
1996 $1,226,200 57.84% $709,200.
For Block 450, Lots 1 and 2,1 am affirming the assessments for each year under appeal. For all years, Lot 1 was assessed at $45,000, and Lot 2 was assessed at $170,600.
Judgments will be entered in accordance with the foregoing determinations.

 This citation refers to a compilation of briefs and other materials filed with the Supreme Court that is available at the State Law Libraty in Trenton.

 A comparison of the language of N.J.S.A. 54:4-3.3 with the language of N.J.S.A. 54:30A-52 does not compel the conclusion that municipally-owned and privately-owned water supply utilities must be valued differently. See Justice Handler's dissent in Hackensack "Water Co. v. Old Tappan Bor., supra, where he concludes that "the thrust of both statutes is to assure that the taxation of water supply land, whether owned and operated by a municipality or a private utility, is undertaken in accordance with the same standards applicable to other real property.” Id. at 221, 390 A.2d 122. Indeed, the Supreme Court’s determinations that different valuation approaches are applicable based upon the identity of the owner of the water supply property may conflict with the requirement in N.J. Const, art. VIII, § 1, ¶ 1(a) that "[p]roperty shall be assessed for taxation ... by uniform rules.” Nevertheless, I am bound by the existing law as established by the Supreme Court.

 The Tax Court found that the underwater lands were "de minimis. ” Newark v. West Milford Tp., supra, 7 N.J.Tax. at 47. One thousand one hundred ninety seven acres may be "de minimis ’’ in the context of 18,548 acres, but 1,197 acres is over one and one-half times the area of the underwater land at the subject properly.

 Defendant's appraiser testified to the following as the basis for such definition. “[I]f you create [that] which wasn’t there before, you’ve improved the properly (sic) and you feel that as a real estate appraiser, as an owner, as a developer, by accumulating this water, by damming or whatever means that you’ve improved the property, then that — that water becomes an improvement . . . .” Trial Tr. (Dec. 20, 1996) at 102-13. This tautological definition is equally applicable to an accumulation of debris or radioactive waste.